UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                   )
DEAN DELAVENTURA, et al.,              )
                                                   )
                        Plaintiff,             )
                                                   )
            v.                                    )        C.A. No. 05-10793-WGY
                                                   )
COLUMBIA ACORN TRUST, et al.         )
                                                   )
                        Defendants.         )
_____)

## DEFENDANTS' OPPOSITION TO MOTION TO REMAND

### INTRODUCTION

This is one of more than twelve state and federal actions against the Columbia funds arising from allegations of market-timing.  The Federal Judicial Panel on Multidistrict Litigation has consolidated twelve of the suits with other market-timing cases in Multidistrict Litigation No. 1586 (the "MDL").  Among the issues before the MDL Court is the scope of preemption under the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 77p(b) and (c) and 78bb(f), and, specifically, whether particular cases within the market-timing MDL are either preempted by SLUSA or should be remanded to state court.  See In re Alger Mutual Fund Litigation, 320 F. Supp. 2d 352 (D. Md. 2004) (setting forth preliminary guidance on SLUSA preemption issues).

Defendants removed this action to federal court and have sought a transfer of this action to the MDL where it can be resolved with the other market-timing cases alleging causes of action arising from similar facts.  On May 6, 2005, the Federal Judicial Panel issued a Conditional Transfer Order transferring this case to the MDL.

Plaintiff has now filed three pleadings opposing transfer to the MDL, two in this Court —

a motion to remand and an opposition to Defendants' motion for a stay — and one before the

Federal Judicial Panel, an opposition to the transfer.  Plaintiff does not contest that this case is

"related" to the market-timing that is the subject matter of the MDL.  Nor has the Plaintiff

addressed why the remand should not be heard with other market-timing cases in the MDL.

Instead, Plaintiff claims that this Court's decision in <u>Meyer v. Putnam International Voyager

Fund</u>, 220 F.R.D. 127 (D. Mass. 2004), requires a remand.

Plaintiff's remand motion ignores the following reasons why the question of SLUSA

preemption should be heard by the MDL.

- First, in June, 2004, *after Meyer had been decided,*  the Federal Judicial Panel
  created the MDL specifically to create uniform rules of decision on the various
  issues implicated by the market-timing litigation — SLUSA preemption among
  them.  The MDL Court has already issued a decision addressing the scope of
  SLUSA and the considerations that govern remand and has exercised its authority
  under SLUSA to ensure that discovery is coordinated between the federal cases
  and cases previously remanded to state court.  <u>See</u>, <u>Alger</u>, 320 F. Supp. 2d at 357.
  <u>Id</u>.

- Second, Plaintiff's claims — although docketed as state law contract claims —
  arise out of an SEC enforcement action concerning the Columbia funds which
  alleges securities fraud in connection with the purchase or sale of securities, in
  violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78(b) and Rule 10b-5
  thereunder.  In fact, Plaintiff's complaint refers to and incorporates by reference
  the allegations in the SEC's complaint, related charges filed by the New York
  Attorney General, and a settlement relating to the Columbia funds announced by
  the SEC in early 2005.  Close review of Plaintiff's complaint, applying the
  scrutiny mandated by SLUSA, reveals Plaintiff's claims to allege
  misrepresentations and/or omissions or the use of a manipulative device in
  connection with the purchase or sale of securities.

- Third, <u>Meyer</u> does not control this case.  This case concerns Plaintiff's claims for
  breach of contract which are based on representations and warranties set forth in
  the prospectus.  <u>Meyer</u> concerned claims for breach of fiduciary duty, claims
  closer to the established SLUSA exclusions (although such claims are more
  properly pled as derivative rather than direct).  Meyer also did not incorporate by
  reference the specific allegations of fraud in connection with the purchase or sale
  of securities made by governmental authorities, as does Plaintiff here.  In any
  event, cases decided since <u>Meyer</u> was issued more than a year ago have held that

so-called holders claims like those here are removable under SLUSA except in narrow circumstances not present here.

Plaintiff offers no reason why this case should be heard in state court, instead of with the hundreds of other cases in the MDL, including the twelve cases that allege claims arising from market-timing in the Columbia Funds.  Although Plaintiff liberally cites non-controlling cases from outside of this jurisdiction, he fails to discuss the substantial procedural and legal developments over the past eighteen months since <u>Meyer</u> was decided.  Those developments plainly support removal here.

For example, on June 2, 2004, Federal District Judge Frederick J. Motz (one of the four judges appointed to the MDL panel) issued an opinion addressing, on a preliminary basis, the several pending remand motions in the three class actions assigned to his MDL "track", which includes the Columbia mutual funds.  <u>See</u> <u>In re: Alger Mutual Fund Litigation</u>, 320 F. Supp.2d 352, 353 (D. Md. 2004).  The Court stressed the need for a uniform rule of decision "in a complex financial environment in which innumerable institutions and firms participate."  <u>Id</u>. at 356.

Although Judge Motz ultimately deferred ruling on the pending motions because of the need for a uniform rule of decision in the market-timing cases, he observed that there are compelling reasons for removal under SLUSA and for the remand determination to take place in the MDL.  First, important "federal interests" are at stake:  "[t]he alleged wrong doing giving rise to the plaintiffs' claims occurred in the national securities market — a market extensively regulated by federal authorities."  <u>Alger</u>, 320 F. Supp. 2d at 355.  Second, "fair and equitable treatment of all persons in a definable class who have suffered the same type of injury weighs in favor of a uniform federal remedy."  <u>Id</u>. at 356.  In these circumstances,

> [p]rinciple, policy and common sense all appear to dictate that if holders of mutual fund shares suffered dilution of the value of their shares from wrong doing

in a securities market, a national forum should be open to them, regardless of
whether or not they purchased or sold shares during the class period to ensure that
all who were similarly damaged are similarly treated.

Id. at 356.

## BACKGROUND

### A.    The Judicial Panel Has Created An MDL To Address All Issues Relating To Marketing Timing And Late Trading, Including Issues Of SLUSA Preemption

On February 20, 2004, the Judicial Panel on Multidistrict Litigation ("MDL Panel")

transferred and consolidated over 90 actions into In re Mutual Funds Litigation, MDL-1586, in

the United States District Court for the District of Maryland.  These actions were consolidated on

the basis that they all arose out of allegations of market-timing and/or late trading in the mutual

fund industry.

Since then, the Federal Judicial Panel has transferred hundreds of actions that "share

sufficient questions of fact" with the previously consolidated market-timing actions to the MDL.

The MDL Panel explicitly empowered the transferee judge to resolve remand motions in the

transferred actions.  See MDL Transfer Order, Dec. 8, 2004 (citing In re Ivy, 901 F.2d 7 (2d Cir.

1990)) (economies favor a single judge ruling on motions to remand in cases involving common

issues of law and fact).  Accord In re Prudential Insurance Company of America Sales Practices

Litigation, 170 F. Supp.2d 1346, 1347-48 (J.P.M.L. 2001)).  Some of those actions were

originally filed in federal court while others were originally filed in state court and removed to

federal court, like the one that was filed before this Court.

The MDL Panel named four federal district judges, (Judges Catherine Blake, Andre

Davis, Frederick Stamp, and J. Frederick Motz).  These judges divided the cases by mutual fund

families into four separate tracks.  One of the primary purposes of consolidating these cases

before the MDL Panel is to achieve consistency and judicial economy in ruling on the numerous,
complex and often novel issues of law arising from the application of the Securities Act of 1933,
the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment
Advisor's Act of 1940, the Private Securities Litigation Reform Act ("PSLRA"), and "SLUSA"
to the claims of market-timing and late trading in the mutual fund industry. Indeed, the MDL
Panel is scheduled to hear oral argument this week on numerous motions to dismiss consolidated
complaints. The motions to dismiss raise a host of legal questions, including issues of first
impression and issues presenting a conflict among the circuits. The benefits of achieving
consistency in ruling on the varied issues arising from these cases are obvious.

**B.      The Allegations of the Delaventura Complaint**

Plaintiff Dean Delaventura brings this action against mutual funds in the Columbia
family of funds on behalf of himself and other "holders of Class B fund shares of Columbia
mutual funds as of February 24, 2004". (Complaint, ¶ 1). Plaintiff contends that the members of
the putative class should be excused from having to pay Contingent Deferred Sales Charges
("CDSCs"), which are ordinarily assessed against Class B shareholders who sell their shares any
time prior to six years after the purchase of the shares.[1]

Plaintiff alleges that he is entitled to this extraordinary relief because "Columbia through
certain of its employees (and agents) engaged in misconduct constituting a breach of contract
with holders of Class B shares in a Columbia Fund." (Complaint, ¶ 2). The complaint alleges
that defendants breached their agreement with Plaintiff by "actions [that] give rise to serious
doubts concerning the integrity of defendants." Specifically, Plaintiff refers to and incorporates
allegations made in market-timing enforcement actions brought by the Attorney General of New

---

[1]    Alternatively, the complaint seeks a refund for those who sold their shares on or after
February 24, 2004 and have already paid CDSCs.

York and by the SEC, both initiated on February 24, 2004, and in a settlement with the SEC

reached in early 2005 by the distributor and advisor to the Columbia funds.[2] Id. ¶¶ 3, 22-24.  See

In the Matter of Columbia Management Advisors, Inc. and Columbia Funds Distributor, Inc.

attached hereto as Exhibit B.  Needless to say, the conduct alleged in the SEC  and NYAG

enforcement actions is also front and center in the other twelve market-timing actions against

Columbia funds that have been consolidated in the MDL.

    More significantly, although clad in state law garb, the complaint alleges a federal

securities claim.  The complaint, artfully drafted to avoid federal jurisdiction, casts the

misconduct as a breach of an agreement, rather than as a misrepresentation or omission in

connection with the purchase or sale of securities.  (Complaint, ¶ 2).  Close review , however,

demonstrates that the alleged wrongdoing giving rise to Plaintiff's claim for relief is not a breach

of contract, but alleged fraudulent statements in connection with the purchase or sale of

securities.  What Plaintiff refers to throughout the complaint as "the agreement" is patently the

prospectus, the document distributed in connection with the purchase and sale of mutual fund

shares.

    Review of the SEC enforcement action, which Plaintiff incorporates by reference in its

entirety and upon which he heavily relies (see, e.g., Complaint at ¶¶ 3(b) and 22-27 ), makes

plain that the nature of the misconduct alleged is the failure to disclose that the defendants

---

[2]    In addition, the complaint alleges that the following "facts and circumstances" stemming from
the enforcement actions "constitute a breach of agreement," including: "(a) the payment of $140
million in disgorgement and penalties; (b) the specificity of wrongdoing alleged by the
governmental agencies; (c) the substantial redemptions by shareholders following the charges
being made public; (d) the adverse reporting in the media; (e) the plethora of actions, including
class actions, commenced against defendants; (f) the increased outflow of shareholder funds
from the defendants, and the decreased inflow of funds to defendants, giving rise to possible
adverse consequences for class members, i.e., among other things, increased administrative costs
and forced sales of stock to raise money for redemptions.  Id. ¶ 3.

purportedly permitted market-timing in the funds.  Thus, the underlying SEC enforcement action

alleges that the prospectus misrepresented that market-timing was prohibited at the same time

that the defendants purportedly permitted market-timing in the funds.  SEC v. Columbia

Management Advisors, Inc., Civil Action No. 04-cv-10367-GAO ("SEC Action" attached as

Exhibit A).  That conduct, the SEC alleges, operated as a fraud "in connection with the purchase

and sale of securities," in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78; (b) and

Rule 10b-5 thereunder.  SEC Action ¶ 71.  As a result of this alleged misconduct, as incorporated

into the complaint here, Plaintiff claims that the defendants funds are "tainted" and "dishonest."

Complaint ¶27.

Plaintiff seeks to be relieved from the CDSC precisely because of this alleged fraud in

connection with the purchase and sale of securities.  Thus, Plaintiff alleges that:  "holders should

be given the opportunity to withdraw money from Columbia Funds without a penalty because an

implied term of the agreement *pursuant to which the investments were made* was that Columbia

would conduct itself with a high degree of integrity."  (Complaint ¶ 2) (emphasis added).  Those

statements "pursuant to which the investments were made", if the allegations of the SEC

enforcement action are proven at trial, were false at the time the investments were made.

Thus, the SEC enforcement action alleges that the market-timing took place "from early

1998 through August 2003":

> ¶ 94.  During the period from early 1998 through August 2003, Columbia
> Distributor, by use of the mails or instrumentality of interstate commerce, directly
> or indirectly, acting knowingly or recklessly, effected transactions in, or induced
> or attempted to induce the purchase or sale of securities … by means of a
> manipulative, deceptive, or other fraudulent device or contrivance.

> ¶ 95.  Columbia Distributor disseminated mutual fund prospectuses that made
> untrue statements of material fact or omitted to state facts necessary in order to
> prevent the statements made, in light of the circumstances in which they were
> made, from being materially misleading.

Thus, a fair reading of the Complaint, and of the SEC and NYAG enforcement action allegations

that are incorporated therein, makes clear that the conduct alleged existed at the time Plaintiff

purchased his shares (since those who purchased Class B shares before February 1998 would no

longer owe CDSC fees as of February 24, 2004, six years later); and that it involved and was in

violation of the prospectus "pursuant to which the investments were made."  (Complaint ¶ 2).

### ARGUMENT

I.     **The Interests of Judicial Economy, Jurisprudential Consistency and Federal
       Regulatory Preemption Warrant Consolidating This Action Before the Multi-
       District Litigation Panel Coordinating the Nationwide Mutual Fund Cases**

This case should be consolidated with the other cases pending before the MDL Panel.

Plaintiff alleges that the class is entitled to waiver of the CDSC that became applicable

immediately upon the purchase of Plaintiff's shares because of a "breach of the agreement"

between the defendants and the class members that arose when the alleged market-timing

occurred.  (Complaint ¶ 3).  This so-called agreement, in reality, consists of the disclosures made

in the defendant funds' prospectuses through which the mutual funds offered shares to the

investing public.  In essence, Plaintiff's complaint is that the class would not have purchased

their shares if the mutual funds had disclosed that they would permit market-timing.  While

Plaintiff tries to argue cloak his claim as solely that of a "holder" of securities, this is a classic

claim arising from the purchase or sale of a covered security that SLUSA mandates must be

brought in federal court.  Moreover, these are the very claims being addressed in the hundreds of

cases now pending in the MDL.

Five months after this Court decided <u>Meyer</u>, Judge Motz addressed in the MDL

proceeding an argument similar to the one now raised by the motion to remand addressed to this

Court.  <u>See</u> <u>In Re: Alger Mutual Fund Litigation</u> subtrack, 04-MD-15863,  320 F. Supp.2d 352

(D. Md. June 2, 2004).  Judge Motz deferred decision on the motions to remand that were then

before him" to avoid making rulings that in the long run may prove academic, disruptive and costly to decide" Id. at 356 fn. 5.  In doing so, however, he issued a carefully reasoned opinion that identified various grounds supporting the application of SLUSA to claims similar those asserted in the Delaventura case filed in this Court.

Judge Motz's opinion concerned motions to remand in three separate state court class actions and one state law non-class action.  Judge Motz noted at the outset that an action is removable under SLUSA "if four conditions are met:  (1) the suit is a 'covered class action,' (2) the plaintiffs' claims are based on state law, (3) one or more 'covered securities' has been purchased or sold, and (4) the defendant misrepresented or omitted a material fact [or used or employed any manipulative or deceptive device or contrivance] 'in connection with the purchase or sale of such security.'" Id. at 354.  (quoting Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1342 (11th Cir. 2002)).  The first three conditions were undisputed but plaintiffs contended, as in the instant case, that their claims did not arise from any material misrepresentations or omissions made by defendants (or any manipulative or deceptive device used by defendants) in connection with plaintiffs' purchase or sale of a covered security.  Rather, plaintiffs argued, as here, that their claims arose from their status as *holders* of mutual fund shares and that those claims were not removable under SLUSA.  Id. at 354.

The court noted that plaintiffs' allegations in their complaints as to who had been harmed were broad enough to include within the proposed classes persons who purchased and/or sold mutual fund shares during the class period.  Id.  Likewise, the instant case proposes a class of persons whose claims arose on the day they *purchased* their shares because it is on that day that they became subject to the CDSC, which they are now attempting to avoid.  Plaintiff here defines the class as "plaintiff and all other holders of Class B shares of Columbia mutual funds as of

February 24, 2004 which are still subject to a [CDSC]." Moreover, Plaintiff class here is harmed

only if they *sell* their securities, at which point the CDSC is exacted.  Complaint ¶ 1.  This is

precisely what the SEC alleged in bringing the enforcement action whose allegations Plaintiff

incorporated into this complaint.  On February 24, 2004 the SEC announced that it had filed a

civil fraud complaint against Columbia Management Advisors, Inc. and Columbia Funds

Distributor, Inc., who are not named as defendants in this case.  (Complaint ¶ 23).[3]  The SEC

explicitly alleges that the misconduct alleged in the SEC's complaint occurred in connection

with the purchase or sale of a security (see SEC enforcement action complaint ¶ 71).  In addition,

the prayer for relief at the end of the Complaint before this Court does not distinguish between

shares held as of February 24, 2004 and shares purchased after February 24, 2004 by those who

held shares as of February 24, 2004.

      Moreover, Judge Motz explained in his June 2004 opinion that, while plaintiffs argued

that only their trading was relevant for SLUSA purposes:

> [t]here is, however, an alternative way in which the issue can be analyzed:  to
> focus upon the late trades and market-timed transactions allegedly permitted by
> the mutual funds and engaged in by the hedge funds.
>
> **If that approach were followed, removal of class actions would be proper
> under SLUSA on that ground alone**.  15 U.S.C. § 77p(b)&(c).  <u>Cf. Nekritz v.
> Canary Capital Partners, LLC</u>, No. 03-5081 (D.N.J. Jan. 12, 2004).

<u>Id</u>. at 355 (emphasis added).  The Court observed that even if the "in connection with" language

in SLUSA was meant to mirror the interpretation of the same language in SEC Rule 10b-5, the

Supreme Court's recent interpretation of that language in <u>SEC v. Zandford</u>, 535 U.S. 813 (2002),

suggests that this language "should not be mechanically applied" and that the "in connection

---

[3]  The SEC has not filed suit against, or alleged any wrongdoing by, any of the Columbia mutual
funds named in the instant complaint, contrary to what Plaintiff incorrectly suggests in his
complaint and motion to remand.

with" nexus is satisfied whenever the alleged fraud "coincides" with the purchase or sale of securities. Id. at 355. In Zandford, the Supreme Court held that the "in connection with" requirement can be satisfied even where the plaintiff or injured party is not the one who effects the purchase or the sale. In Zandford, a broker sold shares belonging to his client without his client's knowledge and pocketed the proceeds for himself. The Supreme Court held that these wrongful sales satisfied the "in connection with requirement" even though the injured party (the client) had not himself effected any sales. Zandford, 535 U.S. at 824. Likewise, the Supreme Court in Zandford cited its earlier holding in the O'Hagen case, where the Court found that the purchase of securities (options) by the defendant satisfied the "in connection with" requirement even though the plaintiff was not a party to the purchase. Id.[4]

Just as the purchases and sales reflected in the late trading and market-timing activities alleged in the complaints before Judge Motz "coincided" with the fraud asserted by the plaintiffs Id. at 355-357, here too Plaintiff is claiming deceit and misrepresentation by the fund defendants through their prospectus disclosures that "coincided" with the purchase and selling activity that the funds allegedly condoned on the part of the market timers and late traders. The same analysis advanced by Judge Motz thus applies here as well.

Judge Motz also explained that the "prudential concerns" that gave rise to the PSLRA and SLUSA — namely, "[t]he need for a single rule of decision in a complex financial environment in which innumerable institutions and firms participate" Id. at 356 — weighed

---

[4] But see Dabit v. Merrill Lynch, 395 F.3d 25, 38 (2d Cir. 2005) (private litigant required to establish status as purchaser or seller to establish Section 10(b) and Rule 10b-5 claim). Cf. Kircher v. Putnam Funds Trust, 403 F.3d 478 (7th Cir. 2005) (interpreting "in connection with" requirement in SLUSA as tracking the "full scope" of that language in 10(b), which permits enforcement actions under 10(b) as long as someone bought or sold a security and requiring SLUSA removal even where plaintiff does not allege any purchase or sales himself during class period).

strongly in favor of interpreting the "in connection with" language in such a way as to promote

federal jurisdiction.. Judge Motz thus stated that:

> Those same considerations appear to weigh strongly in favor of SLUSA removability. In enacting both SLUSA and the Private Securities Litigation Reform Act ("PSLRA"), Congress has manifested its concern about the proliferation of securities litigation, and the applicability of Blue Chip Stamps here must be viewed with those statutes in mind. Moreover, the federal interests at stake in these proceedings are substantial. The alleged wrongdoing giving rise to plaintiffs' claims occurred in the national securities market — a market extensively regulated by federal authorities. Effective, coordinated, and timely resolution of the issues presented in this litigation is important both for the health of the national economy and for the maintenance of public confidence in the mutual fund industry. The appropriate method of pricing mutual fund shares, which is governed by the Investment Company Act and regulations promulgated pursuant to it, is drawn into question by plaintiffs' claims. Although this alone is insufficient to create a federal question for purposes of removability, the effect of decisions made in this litigation upon the regulatory pricing scheme would seem to be a prudential consideration that should be taken into account in determining the scope of SLUSA and the applicability of Blue Chip Stamps to holders of mutual fund shares.

Id. at 355-356. The Court further noted that: "Likewise, fair and equitable treatment of

all persons in a definable class who suffered the same type of injury weighs in favor of a

uniform federal remedy." Id. at 356.

> Finally, the Court noted that:

> Thus, even recognition of a federal cause of action under Rule 10(b)(5), which would serve these important federal interests, might well not be barred by Blue Chip Stamps. [Footnote omitted] The "danger of vexatious litigation … from a widely expanded class of plaintiffs under Rule 10(b)(5)" noted by the Court in Blue Chip Stamps, 421 U.S. at 740, 95 S. Ct. at 1927, is not present. ... Indeed, not recognizing a federal cause of action in the context of these cases might greatly increase the danger of vexatious litigation and tend to "benefit … speculators and their lawyers" at the expense of innocent investors. Id. at 739, 95 S. Ct. at 1927 (quoting from SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 867 (2d Cir. 1968))."

Id. at 356.

> The same policy considerations cited by Judge Motz in favor of removal warrant

removal of the instant case to federal court, so that a single rule of law can be applied and

vexatious and uneconomical litigation expenses can be avoided.[5]

## II.    The Doctrine of Complete Preemption Acts As A Presumption In Favor of Removal

Plaintiff argues that its state law based civil action is not removable because the

complaint does not affirmatively allege a federal claim, nor does diversity jurisdiction apply.

See Motion to Remand, p. 3.  Attempting to invoke the "well-pleaded complaint" standard,

Plaintiff argues  that "there appears to be a strong presumption against removal."  Id. at p. 4.  In

cases involving "complete preemption," however, the reverse is true and the well-pleaded

complaint rule has no application.

The "complete preemption" doctrine holds that cases which are "necessarily federal" are

removable to federal court, even when the federal claim is raised by means of a defense.  See

Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8 (2003).  The "complete preemption" doctrine

applies when Congress has expressed a "clear intent" to completely preempt a particular field of

law.  Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 123 n.5 (2d Cir. 2003).

With SLUSA, courts have repeatedly found that Congress has clearly expressed an intent to

completely preempt certain types of class action securities lawsuits.  See Dabit v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 395 F.3d 25, 33 (2d Cir. 2005) ("[I]n enacting SLUSA, Congress

could not have spoken more clearly about its intention to completely preempt the field of certain

types of securities class actions...") (internal quotation marks omitted); Green v. Ameritrade,

---

[5]    Judge Motz ultimately deferred ruling on the remand motions, but noted that even if the cases were remanded and counsel did not agree to a temporary stay of discovery, the court had the authority to do so under SLUSA and the PSLRA, 15 U.S.C. §§ 77z-1(b)(4) and 78u-4(b)(3)(D). Judge Motz then observed that "it is likely I would grant a stay in any remanded action (including the ones subject to the present motions) to the extent necessary to assure that the state and federal proceedings are effectively coordinated.  Id. at 356.

Inc., 279 F.3d 590, 596 (8th Cir. 2002); Falkowski v. Imation Corp., 309 F.3d 1123, 1128 (9th Cir. 2002). Congress' purpose in enacting SLUSA was to prevent plaintiffs from avoiding the heightened pleading requirements under the Private Securities Litigation Reform Act by bringing securities actions in state court. Kircher v. Putnam Funds Trust, 403 F.3d 478, 482 (7th Cir. 2005).

In securities cases involving misrepresentations, the "complete preemption" doctrine essentially acts as a presumption in favor of removal in cases in which the complaint is unclear as to whether SLUSA is applicable. See Dabit, 395 F.3d at 46 (preemption under SLUSA is required when a "holders" claim is unclear regarding whether the class includes purchasers or sellers); see also, Atencio v. Smith Barney, et al., 2005 U.S. Dist. Lexis 1526, *15 (S.D.N.Y Feb. 2, 2005). Here, the Court must analyze the complaint to ensure that SLUSA would not preempt the claims of any of the class members. If Plaintiff has failed to make it expressly clear that the claims avoid preemption under SLUSA, then the Court must deny Plaintiff's motion to remand.

## III. The Claims Asserted Are Plainly In Connection With The Purchase And Sale of Securities

In this action, Plaintiff purports to sue on behalf of a Class of "holders" of Class B shares of mutual funds as of February 24, 2004. (Complaint ¶ 1). In so styling his class as one of "holders," Plaintiff seeks to avoid SLUSA. It is well settled that the 'in connection with' requirement is satisfied in actions in which the defined class does not expressly exclude purchasers and sellers. For instance, in Kircher v. Putnam Funds Trust, the Court of Appeals for the Seventh Circuit dismissed such claims as preempted by SLUSA. 403 F.3d 478, 482 (7th Cir. 2005). "As an effort to evade SLUSA", the Court held, simply defining a class of holders "is a flop": some of the investors who held shares during the class period must have also *purchased* or *sold* during that time. Id. As the Court observed:

> Some of the investors who held shares during the class period must have purchased their interest (or increased it) during that time; others, who owned shares at the beginning of the period, undoubtedly sold some or all of their investment during the window. Each of the funds has substantial daily turnover, so the class of "all holders" during even a single day contains many purchasers and sellers. All of these class actions must be dismissed.

Id.

Similarly, in <u>Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 395 F.3d 25, 44 (2d Cir. 2005), the Court of Appeals for the Second Circuit dismissed claims asserted by a "'holding' class [that] as defined includes purchasers and thus that the putative class includes allegations triggering SLUSA preemption." A string of other recent cases has reached the same result. <u>See</u>, <u>also</u>, <u>Rowinski v. Salomon Smith Barney</u>, 398 F.3d 294, 303-304 (3d Cir. 2005) (inclusion of purchasers and sellers of misrepresented securities in class definition mandates dismissal of entire action); <u>Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 292 F.3d 1334, 1345 (11th Cir. 2002) (SLUSA preempts claims which include actual purchases or sales of securities).

In the present case, Plaintiff's class definition of holders of Class B shares as of February 24, 2004 fails to avoid preemption under SLUSA. See Complaint, ¶1. If the class definition fails to specifically exclude purchasers and sellers, they necessarily fall within the class of holders. <u>Id</u>. at 483. Such is the case here, as Plaintiff's class definition fails to expressly exclude purchasers and sellers. Therefore, the 'in connection with' requirement is satisfied and this action falls within the scope of SLUSA preemption.

Indeed, in <u>Dabit</u> the Second Circuit stressed that the burden falls entirely on the plaintiff to plead a claim that excludes purchasers and sellers. There, the amended complaint alleged only the retention of a defined class of stocks during the class period and was "silent about when or how Dabit himself or any of his clients came to own any of these stocks." <u>Id</u>. The Court found

that the failure by the plaintiff to distinguish purchasers and sellers, on the one hand, from those

who had only held in the class period, on the other, was itself grounds for dismissal:

> [w]here, as here, the complaint does not include sufficient information to permit
> the court to identify and separate preempted and non preempted subclasses, we
> believe that the proper approach will ordinarily be to dismiss the entire claim
> pursuant to SLUSA.  Given the close relationship in most instances between a
> holding claim and the purchase of securities, and given SLUSA's manifest intent
> to preempt state-law claims alleging fraud in connection with the actual purchase,
> it is sensible to require a would-be "holding" lead plaintiff expressly to exclude
> from the class claimants who purchased in connection with the fraud and who
> could therefore meet the standing requirement for maintenance of a 10b-5 action."

Id. at 59.

## IV.    The Plaintiff Clearly Alleges Misrepresentations

SLUSA preemption is warranted because Plaintiff alleges misrepresentation claims in

connection with a purchase and sale.  Plaintiff alleges that the misconduct constituting the breach

includes "the specificity of wrongdoing alleged by government agencies."  Complaint ¶ 3(b).

This wrongdoing, according to the SEC in the enforcement action relied upon in the complaint,

was the defendants' failure to disclose the existence of market timing activity in the prospectus.

See Columbia Complaint.  According to the SEC, the fraud alleged was committed "in

connection with a purchase or sale of securities" in violation of Section 10(b) of the Exchange

Act, 15 U.S.C. § 78(b) and Rule 10b-5 thereunder. Columbia Complaint ¶ 71.  Therefore, by

relying on the SEC's detailing of the wrongdoing, Plaintiff asserts that the alleged fraud – the

failure to disclose market timing in the prospectus – constituted the alleged breach.  Simply put,

plaintiff seeks relief from the CDSC charge because of the alleged fraud "in connection with a

purchase or sale of securities."

This alleged misrepresentation, fraudulently induced Plaintiff to make purchases.  See

infra, Section B at 5 to 7(explaining that the alleged misconduct existed at the time of class

members' purchases); Complaint ¶ 2 ("…an implied term of agreement *pursuant to which investments were made* was that Columbia would conduct itself with a high degree of integrity and the fact that Columbia *did not so conduct itself* amounts to a breach of contract …").

## V.     The Meyer Case Is Inapposite

Meyer v Putnam, on which the Plaintiff relies, was decided prior to the creation of the MDL and prior to the Dabit and Kircher decisions discussed throughout this opposition.  In Meyer, this Court found the complaint "sufficiently clear to exclude claims asserted in connection with the purchase or sale of the Funds" and therefore, held that SLUSA, which applies only to claims *in connection with the purchase or sale* of a security, did not preempt Meyer's claims.  See 15 U.S.C. § 78bb(f)(1) (stating SLUSA requirements).  This litigation is distinguishable from Meyer because the Complaint includes claims based on class members' purchases and sales of securities.  Accordingly, the SLUSA *in connection with* requirement is met and Plaintiff's claims are preempted.

> **A.     Whereas the Fiduciary Duty Alleged in Meyer Arose After the Class Members Purchased Their Shares , Plaintiff Alleges in this Case that the Contract Defendants Allegedly Breached Induced the Class Members to Purchase Their Shares**

While Meyer is a breach of fiduciary duty case, this litigation is styled as a breach of contract case.  The difference is important because, while the Meyer plaintiff alleged that he was owed a fiduciary duty that took effect upon class members' purchases of shares, Plaintiff here claims that the alleged agreement breached by defendants was an inducing feature relied upon by him when he purchased the securities.   In fact, Plaintiff describes the "[d]efendants' breaches of contract" as "so *material* as to justify Plaintiff and all class members to terminate the contracts …" (emphasis added). Complaint ¶ 32.  By definition, a material breach occurs when an inducing feature of a contract is violated.  See Lease-It, Inc. v. Massachusetts Port Authority, 33

Mass. App. Ct. 391, 396 (1992) (material breach occurs when there is a breach of "an essential and inducing feature of the contract.")

In particular, Plaintiff states that "an implied term of agreement *pursuant to which the investments were made* was that Columbia would conduct itself with a high degree of integrity" (emphasis added). Complaint ¶ 2.  The implied term of agreement that Columbia would conduct itself with a high degree of integrity was a representation that allegedly went unfulfilled, namely, a misrepresentation.  Plaintiff's phrase "pursuant to" indicates that Plaintiff has relied on this misrepresentation when making the investment or purchase.  Although Plaintiff artfully avoids identifying the contract that was allegedly breached, Plaintiff nonetheless alleges that class members purchased securities "pursuant to" a misrepresentation defendants allegedly made.

Therefore, Plaintiff's claims include allegations of misconduct that squarely coincide with class members' purchase of Columbia fund shares, and  SLUSA's requirement that the claims be *in connection with the purchase or sale* of a security is met.  See Riley v. Merrill Lynch, 292 F.3d 1334, 1345 (11th Cir. 2002) ("that class members purchased and then retained … does not necessarily add anything to the basic claim of purchasing, because all investors by definition, hold their shares for at least sometime after purchase").  See also, Atencio v. Smith Barney, et al., 2005 U.S. Dist. LEXIS 1526, (S.D.N.Y. Feb. 1, 2005) (quoting Dabit for the proposition that "a plaintiff who alleges the purchase and retention of securities in reliance on the misrepresentation but who forswears damages from the purchase and seeks only 'holding damages' has still run afoul of SLUSA …").

### B. Whereas In Meyer, the Alleged Harm Was Incurred By Holders, Here, the Alleged Injury Has Been or Will Be Incurred By Sellers

Meyer is different from this litigation in another key respect — in Meyer, the plaintiff alleges harm related to the reduction in the Net Asset Value ("NAV") of the shares.  See Meyer

Class Action Complaint ¶ 79 ("Plaintiff and the other members of the Class have been injured by defendants' wrongdoing.  Indeed, because of Defendants' conduct alleged herein, the NAV or price of the shares … were lower than they might have been otherwise.")  The decrease in NAV was alleged to be a form of injury that investors sustained before redeeming their shares; i.e., without a "sale" of any securities.  Here, on the other hand,  class members seek recovery for damages that will occur only when they sell their shares – only then does the Contingent Deferred Sales Charge ("CDSC") take effect.  See Complaint, Prayers for Relief (iv).  Such an injury, unlike the injury in Meyer, cannot be incurred by a "holder" of securities.

Moreover, the class in this case purports to consist of holders who "have been assessed a CDSC for *redeeming* such shares on or after February 24, 2004," Complaint ¶ 9, i.e., those holders who have already *sold* shares.  In contrast to Meyer, in this case, plaintiff relies on the sale of securities as a basis for relief and include those who as of today have already sold shares in the class – those who are in the class because of their sales and the harm they suffered from selling.  See Meyer, 220 F.R.D. at 129 (Meyer's complaint did not "allege purchase or sale or seek relief on these bases.")  Therefore, the class in this action includes holders, purchasers and sellers, and the Complaint does not provide enough information to determine who is a holder only.  See Dabit v. Merrill Lynch, 2005 WL 44434, *17 (2d Cir. 2005) (when the class definition does not permit the court to distinguish a preempted class from a non-preempted class, SLUSA applies).

### C.    Unlike in Meyer, the Plaintiff Has Not Disavowed that Class Members Purchased In Reliance On Misrepresentations

In Meyer, this Court relied in part upon the plaintiff's explicit denial that he purchased securities in reliance on alleged misrepresentations in deciding that none of the claims were made in connection with a purchase or sale of security.  Meyer, 220 F.R.D at 129.  Nowhere in

the Complaint or Motion to Remand does Plaintiff make any similar disavowal, and accordingly,

the complaint is preempted under SLUSA.  Atencio v. Smith Barney, et al., 2005 U.S. Dist.

LEXIS 1526 (S.D.N.Y. Feb 1, 2005) (noting that "federal courts generally have concluded that a

holders suit [is] impermissible unless the plaintiff's complaint specifically excludes all claims

related to the purchase or sale of securities during the period alleged.")

## CONCLUSION

For the reasons set forth above, the motion to remand should be denied.

Dated:  June 14, 2005                              Respectfully Submitted,

                                                   _/s/ Brien T. O. Connor_____
                                                   Brien T. O'Connor, BBO # 546767
                                                   Giselle J. Joffre, BBO # 658047
                                                   ROPES & GRAY LLP
                                                   One International Place
                                                   Boston, MA 02110-2624
                                                   (617) 951-7000
                                                   *Attorney for Defendants Columbia Acorn Trust,*
                                                   *Columbia Funds Trust I, Columbia Funds Trust II,*
                                                   *Columbia Funds Trust III, Columbia Funds Trust*
                                                   *IV, Columbia Funds Trust V,  Columbia Funds*
                                                   *Trust VI, Columbia Funds Trust VII, Columbia*
                                                   *Funds Trust VIII, Columbia Funds Trust XI*


                                                   _/s/ Brian E. Pastuszenski_____
                                                   Brian E. Pastuszenski, BBO # 391030
                                                   Kevin P. McGrath, BBO # 550123
                                                   GOODWIN PROCTER LLP
                                                   Exchange Place
                                                   53 State Street
                                                   Boston, MA 02109
                                                   (617) 570-1000
                                                   *Attorneys for Columbia Acorn Trust*

Exhibit A

Complaint: Columbia Management Advisors, Inc. and Columbia Funds Distributor, Inc.    Page 1 of 20



Home | Previous Page

U.S. Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Securities and Exchange Commission,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA MANAGEMENT ADVISORS, INC.<br>and COLUMBIA FUNDS DISTRIBUTOR, INC.,<br><br>Defendants. | CIVIL ACTION<br>NO. 04 CV 10367-GAO<br><br>**TRIAL BY JURY<br>DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

### SUMMARY

1. From as early as 1998 and continuing through October 2003, Columbia Management Advisors, Inc. and its predecessor entities (AColumbia Advisors@), the investment adviser to over 140 of the mutual funds in the Columbia mutual fund complex (the "Columbia Funds"), and Columbia Funds Distributor, Inc. (AColumbia Distributor @), the distributor of those funds, allowed certain preferred customers to engage in short-term or excessive trading and never disclosed this fact to other investors.

2. During this period, Columbia Distributor secretly entered into arrangements with at least nine companies and individuals, allowing them to engage in frequent short-term trading in at least seven Columbia Funds, including international funds and a fund aimed at young investors. Columbia Management Advisors knew and approved of all but one of the short-term trading arrangements, and it allowed the arrangements to continue despite knowing such trading could be detrimental to long-term shareholders in the funds. These arrangements increased the advisory fees earned by Columbia Advisors and the compensation paid to Columbia Distributor.

3. The Defendants entered into and/or approved these arrangements despite the fact that they knew or suspected that these investors were engaged in "market timing." After entering into these arrangements, the

nine companies and individuals engaged in frequent short-term or excessive trading in at least sixteen different Columbia Funds.

4. Further, in connection with certain of the arrangements, Columbia Distributor insisted upon receiving so-called "sticky assets" - long-term investments that were to remain in place in return for allowing the investors to actively trade in the funds. In some cases, Columbia Distributor required investors who wanted to engage in frequent short-term trading in certain Columbia Funds to place long-term assets in other Columbia Funds. Such arrangements benefited Columbia Advisors and Columbia Distributor, but posed risks for investors in the funds in which short-term trading was allowed.

5. Throughout the relevant period, the Defendants never disclosed to the long-term shareholders of the Columbia Funds or to the independent trustees of the Columbia Funds the special arrangements they made with these short-term or excessive traders and the potential harm these arrangements posed to the relevant Columbia Funds. The Defendants also did not disclose the resulting conflicts of interest these arrangements created between Columbia Advisors and its clients. Nor did the Defendants disclose the conflicts of interest created by the disparate treatment of investors in the same fund, which was a result of these arrangements (i.e., while investors with special arrangements were allowed to engage in frequent trading, those without such arrangements were not). These non-disclosures constituted material omissions of fact.

6. Further, many of these arrangements and the trades made pursuant to them were directly contrary to certain representations that Columbia Advisors made to investors that the funds did not permit market timing or other short-term or excessive trading because of its harmful effect on the funds. In other cases, these arrangements and trades were contrary to representations that the funds involved would allow no more than three or four exchanges per fund per year. These materially misleading statements and omissions were contained in fund prospectuses that both Columbia Advisors and Columbia Distributor issued to clients and potential clients.

7. Columbia Advisors also had a fiduciary duty to act at all times in the best interests of investors in the Columbia Funds. As a result, Columbia Advisors had an affirmative obligation to act in the utmost good faith, and to provide full and fair disclosure of all material facts, including conflicts of interest, to investors and to the independent trustees of the Columbia Funds. It further had an affirmative obligation to act with reasonable care to avoid misleading investors.

8. By placing its own interest in generating fees from short-term or excessive traders above the interests of long-term shareholders to whom this trading posed a risk of harm, and by failing to disclose these arrangements and the conflicts of interest they created, Columbia Advisors, aided and abetted by Columbia Distributor, breached its fiduciary duty to shareholders in the funds where the short-term or excessive trading took place.

9. By engaging in the transactions and practices alleged in this Complaint,

   a. Columbia Advisors and Columbia Distributor violated Section 10(b) of

the Securities Exchange Act of 1934 (AExchange Act@) and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

b.  Columbia Advisors and Columbia Distributor violated Section 17(a) of the Securities Act of 1933 (ASecurities Act@) [15 U.S.C. § 77q(a)];

c.  Columbia Advisors and Columbia Distributor violated Section 17(d) of the Investment Company Act of 1940 (AInvestment Company Act@) and Rule 17d-1 thereunder [15 U.S.C. § 80a-17(d) and 17 C.F.R. § 270.17d-1];

d.  Columbia Advisors violated, and Columbia Distributor aided and abetted violations of, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (AAdvisers Act") [15 U.S.C. §§ 80b-6 (1) and (2)];

e.  Columbia Advisors violated Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)]; and

f.  Columbia Distributor violated Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)].

10. Unless enjoined, the Defendants will continue to engage in acts, practices, and courses of business as set forth in this Complaint or in acts, practices, and courses of business of similar object and purpose. Accordingly, the Commission seeks the following against each Defendant: (i) entry of a permanent injunction prohibiting it from further violations of the relevant provisions of the federal securities laws; (ii) restitution to investors in the relevant Columbia Funds; (iii) disgorgement of all ill-gotten gains, plus prejudgment interest thereon; and (iv) imposition of civil monetary penalties. In addition, the Commission requests (v) an order permanently enjoining Columbia Advisors from serving or acting with respect to any investment company as an officer, director, member of any advisory board, investment advisor, depositor, or principal underwriter; and (vi) such other equitable relief as the Court deems just and appropriate.

## JURISDICTION

11. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14] and Section 42 of the Investment Company Act [15 U.S.C. § 80a-41]. Additionally, the acts and practices alleged herein occurred primarily within the District of Massachusetts.

12. The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21 of the Exchange Act [15 U.S.C. § 78u], Section 209 of the Advisers Act [15 U.S.C. § 80b-9], and Sections 36(a) and 42 of the Investment Company Act [15 U.S.C. §§ 80a-35(a), 80a-41].

13. In connection with the conduct alleged herein, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges,

and/or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

14. **Columbia Management Advisors, Inc.** (AColumbia Advisors@), an Oregon corporation formerly known as Columbia Management Company, is a wholly-owned subsidiary of Columbia Management Group, Inc. ("Columbia Management"), which is a wholly-owned subsidiary of FleetBoston Financial Corporation (AFleet@). Columbia Advisors, which has offices in Boston, has been an investment adviser registered with the Commission since 1969. In connection with its purchase of Liberty Financial Group ("Liberty") in November 2001, Fleet acquired various Liberty fund groups and investment advisers. The Liberty investment advisers included Liberty Advisory Services Corp., Colonial Management Associates, Inc., Stein Roe and Farnham Inc., Newport Pacific Management, Inc., Newport Fund Management, Inc., and Columbia Funds Management Company. In April 2003, these entities were merged with Fleet Investment Advisors Inc. into Columbia Advisors. (Six of the Columbia Funds, including the Acorn Fund Group, continue to be advised by a separate entity, Liberty Wanger Asset Management.) Columbia Advisors is presently the sponsor of approximately 140 Columbia Funds and remains responsible for all representations made in the prospectuses for those funds.

15. **Columbia Funds Distributor, Inc.** (AColumbia Distributor @), a Massachusetts corporation with offices in Boston, is a wholly-owned subsidiary of Columbia Management and indirect subsidiary of Fleet. Columbia Distributor has been a broker-dealer registered with the Commission since 1992. It acts as the principal underwriter and distributor for the Columbia Funds and, in this role, disseminates the prospectuses for the Columbia Funds. Prior to the acquisition of Liberty in November, 2001, it went by the name of Liberty Funds Distributor, Inc.

## RELATED ENTITY

16. Columbia Fund Services, Inc. (A Columbia Services@), a subsidiary of Columbia Management, is the transfer agent for the Columbia Funds, with responsibility for identifying market timing activity in the funds. Prior to the acquisition of Liberty in November 2001, it went by the name of Liberty Fund Services, Inc.

## FACTS

### Market Timing

17. Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer. The Columbia Funds' Disclosures

Complaint: Columbia Management Advisors, Inc. and Columbia Funds Distributor, Inc.    Page 5 of 20

18. The Columbia Funds are a group of funds currently owned by Fleet. This group includes several funds (e.g., the Acorn, Newport, and Stein-Roe fund groups) that had belonged to Liberty until late 2001, when Liberty was acquired by Fleet. By September 2003, the names of the various fund groups Fleet owned had been changed so that all were uniformly referred to by the name Columbia.

19. From 1998 through 2000, the prospectuses for various of the Columbia Funds contained disclosures stating that shareholders would be limited in the number of exchanges they could make during a given period. For example, the prospectuses for the Acorn Fund Group represented that investors would generally be permitted to make only up to four round trip exchanges per year, defining a round trip as an exchange out of one fund into another fund and then back again.

20. Further, starting in May 1999, certain of the Columbia Funds belonging to the Acorn Fund Group began representing in their respective prospectuses that "[t]he Acorn funds do not permit market-timing and have adopted policies to discourage this practice."

21. In the fall of 2000, a number of the Columbia Funds belonging to Liberty at the time began including in their respective prospectuses the following disclosure, which expressly stated that short-term or excessive trading was prohibited (the "Strict Prohibition"):

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor=s opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

22. By the spring of 2001, the rest of the Columbia Funds belonging to Liberty began including the Strict Prohibition in their prospectuses. Columbia Advisors retained this disclosure language upon Fleet's acquisition of the funds from Liberty, and in early 2002, adopted the same disclosure for most of the funds that had belonged to Fleet prior to the acquisition. In the Spring of 2003, Columbia Advisors amended the Strict Prohibition language in certain of the prospectuses to make clear that other funds distributed by Columbia Distributor similarly reserved the right to reject trade requests from market timers or investors with a pattern of short-term or excessive trading.

### Defendants Agreed to Allow Short-Term or Excessive Trading In Columbia Funds, in Contravention of Disclosures

23. During the period from at least 1998 and continuing through summer 2003, Columbia Distributor managers entered into at least nine arrangements with investment advisers, hedge funds, brokers and individual investors allowing them to engage in frequent trading in particular mutual funds. All but one of these investors made multiple "round trips" (each round trip consisting of a purchase and subsequent

sale) per month and some made hundreds of round trips during this approximately five-year period, in amounts totaling over $2.5 billion. Further, much of this trading was directly contrary to the prospectus disclosure for the funds in which it occurred.

## A. Ilytat's Arrangement and Trading

24. From April 2000 through October 2002, Ilytat, L.P., a San Francisco hedge fund, and its affiliates ("Ilytat") made almost 350 round trips in seven international Columbia Funds. A substantial number of these trades were made pursuant to an arrangement with Columbia Distributor and approved by Columbia Advisors, which allowed Ilytat to engage in frequent and short-term trading in the Newport Tiger Fund (the "Newport Tiger Fund"), an Asian equity fund.

25. Through 2000 and early 2001, the prospectus for the Newport Tiger Fund noted that "[s]hort-term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders." Starting in May 2001, the prospectus included the Strict Prohibition representation.

26. Notwithstanding the language in the prospectus, Columbia Distributor, with the approval of the Newport Tiger Fund's portfolio manager, allowed Ilytat, which it and Columbia Services identified as a market timer, to enter into a "sticky-assets" arrangement. Under this arrangement, Ilytat was to place $20 million in the Newport Tiger Fund, with two-thirds of that amount to remain static and one-third to be actively traded. According to internal calculations for the Newport Tiger Fund, Ilytat made purchases or exchanges totaling over $133 million in the fund in 2000 and redeemed $104 million. Further, during the first five months of 2001, Ilytat's purchases or exchanges accounted for $72 million out of the $204 million in total purchases made by all investors in the Newport Tiger Fund. During the same five-month period, Ilytat made redemptions totaling $60 million.

27. The portfolio manager for the Newport Tiger Fund repeatedly wrote to the President of Columbia Distributor expressing concern about Ilytat=s trading activity and the harm that this trading activity could have on the fund and its investors. By June 2000, the head of Columbia Advisors became concerned that Ilytat appeared to be making weekly trades of $7 million in and out of the Newport Tiger Fund.

28. Notwithstanding these concerns, Ilytat was allowed to continue trading in the Newport Tiger Fund until September 2002. During the 30 months from April 2000 to September 2002 during which it actively traded in the Newport Tiger Fund, Ilytat made almost 90 round trips in amounts of up to $13 million apiece. This activity included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Strict Prohibition representation.

29. Ilytat also traded extensively in the Acorn International Fund during the period from September 1998 through October 2003. From September 1998 through September 2000, the prospectus for the fund stated that investors would be permitted to make only up to four round trips per year. Further, as of May 1999, the prospectus for the fund stated that market timing

would not be permitted in the fund. In addition, by the end of September 2000, the Strict Prohibition representation was included in the fund's prospectus.

30. Despite these representations, from September 1998 through October 2003, Ilytat made 73 round trips in the Acorn International Fund, including 27 round trips in 1999 and 18 round trips in 2000. From July 2000 to December 2001, the period during which it most actively traded the fund, Ilytat made at least 40 round trips in the fund in amounts of up to $15 million. This activity included 27 round trips made after the Strict Prohibition representation had been included in the fund's prospectus.

31. Ilytat also traded extensively in the Acorn International Select Fund during the period from July 2000 through June 2001. Throughout this period, the prospectus for the Acorn International Select Fund included the Strict Prohibition representation. Contrary to this representation, from July 2000 to June 2001, Ilytat made about at least 20 round trips in the Acorn International Select Fund in amounts of up to $3 million.

32. In addition, from September 1999 through October 2000, Ilytat also made more than 40 round trips (over 10 in 1999 and over 30 in 2000) in amounts of $100,000 or more in the Acorn International Select Fund, which went by the name Acorn Foreign Forty Fund at the time. This trading activity was contrary to the representation in the prospectus for the fund that traders would be restricted to four trades per year and further, that market timing would not be permitted.

33. From August 2000 through October 2000, Ilytat also actively traded in the Stein Roe International Fund, making over 80 round trips of up to $1.4 million during this three-month period. In addition, from April 2000 to September 2000, Ilytat actively traded in the Newport International Equity Fund, making approximately 19 round trips during this five-month period in amounts of up to $2 million. During the eight-month period from February 2002 to October 2002, Ilytat also made at least 10 round trips of up to $16 million in the Columbia International Equity Fund (formerly the Galaxy Equity Growth Fund).

34. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Ilytat or Ilytat's trading in the Columbia Funds.

**B. Ritchie Arrangement and Trading**

35. From January 2000 through September 2003, Ritchie Capital Management, Inc. ("Ritchie"), a hedge fund manager, traded frequently in the Newport Tiger Fund and the Columbia Growth Stock Fund (formerly the Stein Roe Advisor Growth Stock Fund) ("Growth Stock Fund").

36. Ritchie made most of its trades in the Newport Tiger Fund. During the period from January 2000 through April 2001, notwithstanding the language in the fund's prospectus regarding the potential harm caused by short-term market timers, Ritchie made over 150 round trips. In addition, from May 2001 through September 2002, Ritchie made over 100 trades in the Newport Tiger Fund even though the prospectus included the Strict

Prohibition representation during this period.

37. In 2001, Columbia Distributor discussed an arrangement with Ritchie under which Ritchie would be allowed to make up to 12 round trips per year in the Newport Tiger Fund. In addition, at the end of 2001, Columbia Distributor=s Senior Vice President met with Ritchie=s principals and discussed the possibility of a "sticky-asset" arrangement. More specifically, they discussed the possibility of Ritchie placing Along-term@ assets in a fixed income fund Ato offset their activity in Tiger." The Senior Vice President's subordinate summarized the proposal as follows: Awe would need to see some money from them...if they were going to continue to use Tiger." At the time, Ritchie's $52 million position in the Newport Tiger Fund accounted for nearly 10% of its $525 million in assets.

38. In early 2002, Ritchie began negotiating with Columbia Distributor an arrangement to actively trade the Growth Stock Fund, a large cap fund, which by then included the Strict Prohibition disclosure in its prospectus. Ritchie=s initial proposal was to place up to $200 million in the fund (which at that time had a total asset value of approximately $776 million), with the ability to trade up to half of that amount every day. Columbia Distributor countered with a proposal to keep 90% of the investment in place for 90 days, with no limit on trades of the remaining 10%. Columbia Advisors= portfolio manager for the fund was aware of these negotiations and provided his input. Shortly thereafter, Ritchie began trading in the Growth Stock fund, making five round trips in two months in amounts of up to $7 million.

39. In early 2003, Ritchie entered into a "sticky-asset" arrangement with Columbia Distributor under which it agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with no limits on the number of trades per month, and place another $10 million in the Columbia Short Term Bond Fund as a Astatic@ (non-trading) asset. The portfolio manager for the Growth Stock Fund approved the arrangement, and Columbia Distributor=s President knew of and acquiesced to it. Overall, pursuant to its arrangements with Columbia Distributor and contrary to Columbia Advisors' Strict Prohibition representation in the fund's prospectus, Ritchie made approximately 18 round trips in the Growth Stock Fund from June 2002 through September 2003.

40. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Ritchie or Ritchie's trading in the Columbia Funds.

**C. Stern's Arrangements and Trading**

41. During late 2002 and early 2003, entities controlled by Edward Stern ("Stern") negotiated trading arrangements with Columbia Distributor through two intermediaries. In early 2003, Epic Advisors, on behalf of Stern=s Canary Investment Management firm, entered into an arrangement with Columbia Distributor, approved by its National Sales Manager, under which Stern entities agreed to make investments in three funds (i.e., the Columbia Growth & Income Fund, the Columbia Select Value Fund, and the Growth Stock Fund, totaling $37 million. Despite the fact that Columbia Advisors had included the Strict Prohibition disclosure in the prospectus for each of these three funds, the arrangement permitted Stern

entities to make three round trips per month in each fund. Stern withdrew from the arrangement only a couple of weeks after making the investment.

42. In late 2002 or early 2003, Stern also entered into an arrangement with Columbia Distributor pursuant to which he placed $5 million in the Columbia High Yield Fund (the "High Yield Fund"), a high-yield bond fund. Despite the fact that Columbia Advisors had included the Strict Prohibition disclosure in the prospectus for the High Yield Fund, Stern was permitted to make one round trip each month in the fund. The portfolio manager for the High Yield Fund approved the arrangement. During the period from November 2002 through July 2003, Stern made seven round trips in an average amount of $2.5 million.

43. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Stern or Stern's trading in the Columbia Funds.

### D. Calugar's Arrangement and Trading

44. In or around April 1999, Daniel Calugar ("Calugar") reached an arrangement with Columbia Distributor allowing him to place up to $50 million in the Columbia Young Investor Fund ("Young Investor Fund"), a fund targeting investments by children with an "educational objective to teach children about mutual funds", and the Growth Stock Fund, with permission to make one round trip per month using his entire position. The portfolio manager for the Growth Stock Fund, as well as Columbia Distributor's Managing Director of National Accounts and Senior Vice President approved the arrangement.

45. In 2000, notwithstanding the supposed terms of the arrangement, Calugar, on average, made more than one round trip every trading day in various of the Columbia Funds. Throughout the year, Calugar made over 200 round trips in the Young Investor Fund, placing trades of up to $2.3 million at a time, and during the four-month period from January 2000 through April 2000, he also made at least 13 round trips in the Stein Roe International Fund.

46. During the period from January 2000 through February 2001, Calugar also made nearly 70 round trips in the Growth Stock Fund, placing trades of up to $4 million at a time. Throughout 2000 and into January 2001, he also made approximately 20 round trips in the Newport International Equity Fund, in amounts of up to $6.6 million.

47. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Calugar or Calugar's trading in the Columbia Funds.

### E. Giacalone Arrangement and Trading

48. In late 2000, Columbia Distributor, with the approval of its President, entered into a "sticky-asset" arrangement with Sal Giacalone ("Giacalone"). Under the arrangement, which was approved by the head of the Newport Fund Group, Giacalone was allowed to make four round trips per month of up to $15 million in the Newport Tiger fund. In return, Giacalone was

required to place $5 million in Along term assets@ in Acorn Funds.

49. Notwithstanding the supposed terms of his arrangement and the language in the prospectus discussing the potential harm caused by short-term market timers, Giacalone made a total of 43 round trips in the Newport Tiger Fund during six months of trading from November 2000 through April 2001. During the first two months of 2001 alone, Giacalone made at least 30 round trips in amounts of up to $4.7 million.

50. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Giacalone or Giacalone's trading in the Columbia Funds.

### F. D.R. Loeser Arrangement and Trading

51. In late 1998, Columbia Distributor entered into an arrangement with D. R. Loeser ("Loeser"), a registered investment adviser, allowing Loeser to make five round trips per month of up to $8 million in the Growth Stock Fund. Columbia Distributor=s Senior Vice President, the President of the Stein-Roe fund complex, to which the Growth Stock Fund belonged at that time, and the Growth Stock Fund portfolio manager all approved the arrangement.

52. During the first five months of 2000, Loeser made approximately 20 round trips in the Growth Stock Fund and another 20 round trips in the Young Investor Fund.

53. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Loeser or Loeser's trading in the Columbia Funds.

### G. Signalert Arrangement and Trading

54. Beginning in 1999, Signalert, a registered investment adviser, began trading in Columbia Funds under arrangements with Columbia Distributor. Initially, Signalert was allowed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund, with the ability to make up to 10 round trips annually in each of these two funds. Under the arrangement, Signalert was also to place $5 million in each of six funds, trading just once a quarter.

55. Columbia Distributor senior management subsequently pushed to increase the size of Signalert's investments. In late 1999, as part of a "sticky-asset" arrangement, Signalert agreed to place an additional $10 million in the Growth Stock and Young Investor funds, and to invest and maintain other assets in a money market fund, thereby allowing Columbia Distributor to generate a management fee from those assets. In return, Columbia Distributor allowed Signalert to make up to 12 round trips per year in each fund. The portfolio manager for both the Growth Stock Fund and the Young Investor Fund approved this arrangement.

56. During the first 11 months of 2000, notwithstanding the supposed terms of the arrangement, Signalert made over 60 round trips in the two funds, one every one to two weeks. Overall, during the period 2000-2001,

Signalert made more than 50 round trips in the Growth Stock Fund and approximately 50 round trips in the Young Investor Fund. Moreover, as of February 2001, Columbia Advisors had represented by way of the Strict Prohibition disclosures in the prospectuses for these funds that short-term or excessive trading would not be permitted. Yet, from February 2001 through August 2001, Signalert made 20 round trips in the Young Investor Fund. It also made over 20 round trips in the Growth Stock Fund from February 2001 through December 2001.

57. Signalert also began trading in four additional funds: the Stein Roe Income Fund (a bond fund), the Acorn Fund (a small to mid cap fund), the Galaxy Equity Value Fund (a large cap fund), and the Galaxy Growth & Income Fund. Despite the fact that the Stein Roe Income Fund and the Acorn Fund both included the Strict Prohibition representation in their prospectuses, Signalert made eight round trips in the Stein Roe Income Fund, all in the month of November 2001, and at least 15 round trips in the Acorn Fund during the period from March 2001 through February 2003. In addition, notwithstanding the fact that the two Galaxy funds generally limited investors to three exchanges per year, Signalert made approximately 23 round trips in the Galaxy Equity Value Fund and more than 25 round trips in the Galaxy Growth & Income Fund in a period of less than a year, from February 2001 through January 2002.

58. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Signalert or Signalert's trading in the Columbia Funds.

**H. Waldbaum's Arrangement and Trading**

59. During late 2002, Columbia Distributor entered into a "sticky-asset" arrangement with investor Alan Waldbaum ("Waldbaum") under which he was allowed to make 10 round trips per year in the Columbia Tax Exempt Fund ("Tax Exempt Fund"), a municipal bond fund, if he moved less than $5 million each time and always kept $2 million in the fund. The arrangement was approved by the portfolio manager for the Tax Exempt Fund.

60. At the time, the prospectus for the Tax Exempt Fund included Columbia Advisors' Strict Prohibition representation. Notwithstanding this representation, Waldbaum made 10 round trips in the Tax Exempt fund from November 2002 through October 2003.

61. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Waldbaum or Waldbaum's trading in the Columbia Funds.

**I. Tandem's Arrangement and Trading**

62. By early 2000, Tandem Financial ("Tandem"), an investment adviser, entered into an arrangement with Columbia Distributor, which was approved by its Senior Vice President. The arrangement permitted Tandem to make an unlimited number of trades in one or more of the Columbia Funds. Overall, pursuant to this arrangement, during the period from February 2000 through September 2003, Tandem made more than 100

round trips in the Tax Exempt Fund.

63. During 2000, Tandem made approximately eleven round trips in the Tax-Exempt Fund. Starting in April 2001, the prospectus for the Tax Exempt Fund prospectus included the Strict Prohibition disclosure. Despite the disclosure, Tandem made 106 round trips during the period from April 2001 through September 2003.

64. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors and independent trustees of the Columbia Funds the arrangement with Tandem.or Tandem's trading in the Columbia Funds.

### Columbia Advisors Knew of and Acquiesced In the Short-Term or Excessive Trading Arrangements

### Negotiated by Columbia Distributor

65. As reflected by internal e-mails, several Columbia Advisors portfolio managers (including those for the Growth Stock Fund, the Newport Tiger Fund, the High Yield Fund, the Young Investor Fund, and the Tax Exempt Fund, one of whom was also the Chief Investment Officer for International Equities), knew of and acquiesced in arrangements, negotiated by Columbia Distributor, allowing excessive or short-term trading of their own funds, even though these arrangements were often contrary to the express representations in the funds= prospectuses. In addition, the senior executive at Columbia Advisors responsible for Columbia Advisors= advisory activity during the period from 1998 through late 2001 was aware of at least one of these arrangements. Further, several senior executives were aware that there was short-term or excessive trading in the Columbia Funds and aware of the concerns voiced by the portfolio managers, among others, about the potential negative impact this trading could have on the funds.

### Defendants Knew That Short-Term or Excessive Trading

### Harmed or Created a Risk of Harm to the Funds

66. Many of the Columbia Funds' portfolio managers, a number of Columbia Distributor executives, and each of the senior executives responsible for Columbia Advisors' advisory activity during the period from 1998 to 2003, knew or recklessly disregarded that short-term or excessive trading caused potential or actual harm and disruption to the Columbia Funds. For example:

(a) By the beginning of 2000, Columbia Distributor=s Senior Vice President expressed concern about the potentially harmful effect that Calugar's frequent trading was having on the relevant Columbia Funds.

(b) In the spring of 2000, shortly after the peak of Calugar=s trading in the Stein Roe International Fund, the fund=s liaison with Columbia Distributor sent an e-mail to the heads of Columbia Advisors, Columbia Distributor and Columbia Services with a chart that he summarized as showing: "for the last 6 weeks . . . $142,018,026 has gone into the Fund and $134,935,372 has gone out. . . .These figures exceed the

total size of the Fund!" He continued, "My goal here is to increase awareness of the magnitude of this problem and to get everyone involved working on a solution on a timely basis."

(c) In August 2000, in an e-mail discussing Ilytat, the portfolio manager for the Newport Tiger Fund, complained about market timers to the head of Columbia Advisors and the President of Columbia Distributor, stating : "Their active trading has increased and it has become unbearable. There will be long term damage to the fund." He further noted, "Let=s understand that they [timers] really are not investors. They take advantage of the fund=s delayed pricing mechanism which almost guarantees a risk free return . . . I hope wholesalers understand that by accepting a flipper=s [i.e., a short-term trader's] investment they do damage to the fund=s performance, tax status, and the other shareholders (their clients)."

(d) In March 2001, in another e-mail sent to the head of Columbia Advisors and to the President of Columbia Distributor, the Tiger Fund portfolio manager stated that "Newport. . .and the fund=s long-term shareholders are all negatively impacted by flippers." He suggested that action be taken. The portfolio manager spoke directly with the heads of Columbia Advisors, Columbia Distributor and Columbia Services about market timing issues, including his concerns about the negative impact on his funds that frequent movements of large amounts of cash in and out of the fund could have, making it difficult to mange the funds. The portfolio manager also spoke with the CEO of their common parent, Columbia Management Group, about the concerns created by this short-term trading.

(e) In July 2002, the portfolio manager for the Tiger Variable Fund experienced a problem with excess cash redemptions. The President of Columbia Services wrote to the President of Columbia Distributor informing him that the fund was "still being plagued by market timers,@ and specifically stating that AThe timers are impacting [the portfolio manager=s] ability to manage this fund, and likewise, impacting shareholders."

(f) In September 2002, Columbia Services reported to Columbia Distributor's Managing Director that, "Despite the tools currently available to us, timers continue to disrupt fund performance and management as well as exaggerate sales figures."

Notwithstanding the concerns raised about the impact this excessive or short-term trading was having on the relevant Columbia Funds, Columbia Advisors and Columbia Distributor continued to allow such trading to take place.

### Columbia Distributor Interfered With Efforts to Halt Short-Term or Excessive Trading

67. Columbia Distributor recognized its obligation to act consistently with fund disclosure prohibiting short-term or excessive trading, and professed to want to prevent short-term or excessive traders from investing in the Columbia Funds. In fact, however, on multiple occasions, Columbia Distributor executives and employees blocked efforts to halt their clients=

trading activity. For example:

(a) In 2000, a Columbia Distributor sales executive halted efforts to stop Giacalone from making almost daily round trips in the Newport Tiger Fund. Although the Giacalone accounts were subsequently shut down, Columbia Distributor=s interference delayed the process and allowed a substantial number of additional trades to be made.

(b) In March 2001, Columbia Distributor=s Senior Vice President intervened when a portfolio assistant to the Acorn International Fund had telephoned the broker responsible for the Ilytat account and asked him to stop Ilytat from violating the fund=s short-term trading policy. The Columbia Distributor executive caused the Columbia Services manager responsible for market timing to telephone the portfolio assistant and tell her that it was "inappropriate" for her to take any direct steps to halt Ilytat=s trading.

(c) By March 2001, with the acquiescence of Columbia Distributor's Senior Vice President, Ilytat had been placed on a list of "Authorized Accounts for Frequent Trading," a list of accounts maintained by Columbia Services against which no action was to be taken, however frequent their trading.

(d) In December 2001, Columbia Distributor=s Senior Vice President intervened when the portfolio manager for Acorn International Fund complained about Ilytat=s market timing adversely impacting her fund and tried to halt it. Ilytat was allowed to continue trading.

(e) In 2002, Columbia Distributor=s Managing Director for National Accounts personally intervened to reverse a stop placed on Ilytat=s trading by Columbia Services market timing surveillance personnel. Ilytat continued trading for almost three more months thereafter.

(f) In January 2003, a Columbia Distributor sales manager insisted that no restrictions be placed on trading by Waldbaum because of the trading arrangement with him.

(g) In early 2003, a sales manager at Columbia Distributor intervened when Columbia Services sought to block Tandem from making any more trades in the Tax-Exempt Fund. She wrote to the Columbia Services market surveillance manager, "Tandem Fin=I . . . are[sic] an advisor that we have a very close relationship with. We definitely do not want to restrict them," and further stated that "there are certain relationships like Tandem that are allowed to time based on prior discussions." As a result of this intervention, Tandem was allowed to continue trading in the Tax Exempt Fund up through October 2003.

(h) In March 2003, a Columbia Distributor executive intervened to allow Signalert to trade in the Columbia High Yield fund, despite a previous bar for excessive trading.

## Columbia Advisors and Columbia Distributor Benefited from Short-Term or Excessive Trading

68. Both Columbia Advisors and Columbia Distributor benefited directly from the short-term trading arrangements. Because Columbia Advisors received advisory fees based on the total assets under management in the funds for which it acted as adviser, it served Columbia Advisors= financial interest to obtain the largest possible investment in a fund. Indeed, in an e-mail, Columbia Distributor's Managing Director set forth certain Aguidelines@ for entering short-term trading arrangements requiring, inter alia, that the investor place non-trading assets in Columbia Funds, to ensure a Aconstant management fee income.@

69. Columbia Distributor earned revenue and its executives were compensated based on the total amount of assets they caused to be invested in the funds. As a result, it was also in Columbia Distributor=s financial interest to do what was necessary to persuade short-term traders to place money in the funds.

## FIRST CLAIM

### (Defendants Columbia Advisors and Columbia Distributor)
### Fraud in the Purchase or Sale of Securities in Violation of Exchange Act § 10(b) and Rule 10b-5

70. Plaintiff Commission repeats and realleges paragraphs 1 through 69 above.

71. Columbia Advisors and Columbia Distributor, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

72. The conduct of Columbia Advisors and Columbia Distributor involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## SECOND CLAIM

### (Defendants Columbia Advisors and Columbia Distributor)
### Fraud in the Offer or Sale of Securities in Violation of Exchange Act § 17(a)

73. Plaintiff Commission repeats and realleges paragraphs 1 through 72 above.

74. Columbia Advisors and Columbia Distributor, directly and indirectly, in the offer or sale of securities by the use of the means or instruments of

transportation or communication in interstate commerce or by the use of the mails: (a) acting knowingly or recklessly, have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities, in violation of § 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM

### (Defendants Columbia Advisors and Columbia Distributor) Joint Arrangement in Violation of Section 17(d) of the Investment Company Act and Rule 17d-1 Thereunder

75. Plaintiff Commission repeats and realleges paragraphs 1 through 74 above.

76. Each of the Columbia Funds was a registered investment company.

77. Columbia Advisors, which was the investment adviser for the Columbia Funds, and Columbia Distributor, which was the principal underwriter for the Columbia Funds, are and were affiliates of the Columbia Funds.

78. Columbia Advisors and Columbia Distributor effected transactions in which certain of the Columbia Funds were joint participants with Columbia Advisors and Columbia Distributor, in contravention of rules and regulations the Commission has prescribed for the purpose of limiting or preventing participation by registered companies, such as the Columbia Funds, on a basis different from or less advantageous than that of such other participants.

79. Columbia Advisors and Columbia Distributor participated in such joint arrangements even though the Commission did not grant an exemption from the statutory prohibitions (pursuant to the filing of an application, or otherwise) with respect to such joint enterprises or arrangements.

80. As a result, Columbia Advisors and Columbia Distributor violated § 17 (d) of the Investment Company Act and Rule 17d-1 thereunder [15 U.S.C. § 80a-17(d) and 17 C.F.R. § 270.17d-1].

### FOURTH CLAIM

### (Defendant Columbia Advisors) Fraud by an Investment Adviser in Violation of Sections 206(1) and 206(2) of the Advisers Act

81. Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

82. Columbia Advisors was an Ainvestment adviser@ within the meaning of

Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

83. Columbia Advisors, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (a) acting knowingly or recklessly, has employed devices, schemes, or artifices to defraud; or (b) has engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

84. As a result, Columbia Advisors has violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### FIFTH CLAIM

**(Defendant Columbia Distributor)**
**Aiding and Abetting Columbia Advisors' Violations of**
**Sections 206(1) and 206(2) of the Advisers Act**

85. Plaintiff Commission repeats and realleges paragraphs 1 through 84 above.

86. Columbia Advisors= conduct as alleged herein violated §§ 206(1) and 206(2) of the Advisers Act.

87. Columbia Distributor knew or recklessly disregarded that Columbia Advisors=s conduct was improper and it knowingly rendered to Columbia Advisors substantial assistance in this conduct.

88. As a result, Columbia Distributor aided and abetted Columbia Advisors= violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### SIXTH CLAIM

**(Defendant Columbia Advisors)**
**Fraudulent Disclosure in Investment Company Filings in**
**Violation of Section 34(b) of the Investment Company Act**

89. Plaintiff Commission repeats and realleges paragraphs 1 through 88 above.

90. Columbia Advisors made untrue statements of a material fact or omitted to state facts necessary in order to prevent statements it made, in the light of the circumstances under which they were made, from being materially misleading in registration statements, applications, reports, accounts, records, or other documents filed with the Commission or the keeping of which is required by registered investment companies.

91. As a result, Columbia Advisors violated Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33].

### SEVENTH CLAIM

**(Defendant Columbia Distributor)**

### Fraud by Broker or Dealer in Violation of Section 15(c) of the Exchange Act

92. Plaintiff Commission repeats and realleges paragraphs 1 through 91 above.

93. During the period from early 1998 through August 2003, Columbia Distributor was a broker or dealer as those terms are defined by Section 3 (a)(4) and (5) of the Exchange Act [15 U.S.C. § 78c(a)(4),(5)].

94. During the period from early 1998 through August 2003, Columbia Distributor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting knowingly or recklessly, effected transactions in, or induced or attempted to induce the purchase or sale of securities (otherwise than on a national securities exchange of which it was a member) by means of a manipulative, deceptive, or other fraudulent device or contrivance.

95. Columbia Distributor disseminated mutual fund prospectuses that made untrue statements of a material fact or omitted to state facts necessary in order to prevent the statements made, in the light of the circumstances under which they were made, from being materially misleading.

96. As a result, Columbia Distributor violated § 15(c) of the Exchange Act [15 U.S.C. § 78o(c)].

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a Final Judgment:

#### I.

Permanently enjoining each of Columbia Advisors and Columbia Distributor from violating, directly or indirectly:

    a. Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

    b. Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

    c. Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder [15 U.S.C. § 80a-17(d) and 17 C.F.R. § 270.17d-1]; and

    d. Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. " 80b-6 (1), (2)];

#### II.

Permanently enjoining Columbia Advisors from violating, directly or indirectly, Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)];

### III.

Permanently enjoining Columbia Distributor from violating, directly or indirectly, Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)];

<32 class="center">IV.

Finding that Columbia Advisors breached its fiduciary duty in a manner involving personal misconduct and permanently enjoining Columbia Advisors, pursuant to Section 36(a) of the Investment Company Act [15 U.S.C. § 80a-35(a)], from serving or acting with respect to any registered investment company as an officer, director, member of any advisory board, investment adviser, depositor, or principal underwriter;

### V.

Requiring Columbia Advisors and Columbia Distributor to disgorge their ill-gotten gains related to the violations, as well as prejudgment interest thereon, with said monies and interest to be disbursed in accordance with a plan of distribution to be ordered by the Court;

### VI.

Requiring Columbia Advisors and Columbia Distributor to pay restitution to shareholders harmed by their fraud;

### VII.

Requiring Columbia Advisors and Columbia Distributor to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t (d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be determined by the Court; and

### VIII.

Ordering such other and further relief as this case may require and the Court deems appropriate.

### JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMI**

By its attorneys,

_____ /s/ _____
Luke T. Cadigan

Complaint: Columbia Management Advisors, Inc. and Columbia Funds Distributor, Inc.     Page 20 of 20

Senior Trial Counsel (BBO# 561117)
Celia Moore
Deputy Asst. Dist. Administrator (BBO# !
Paul Block
Senior Counsel (BBO# 551158
David London
Senior Counsel (BBO# 638289

73 Tremont Street, Suite 600
Boston, Massachusetts
(617) 424-5900 ext. 203 (Cadigan)
(617) 424-5900 ext. 628 (Block)
(617) 424-5940 (Facsimile)

Dated: February 24, 2004

*http://www.sec.gov/litigation/complaints/comp18444.htm*

Home | Previous Page                                    Modified: 02/25/2004

Exhibit B



**U.S. Securities and Exchange Commission**

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**Securities Act of 1933**
**Release No. 8534 / February 9, 2005**

**Securities Exchange Act of 1934**
**Release No. 51164 / February 9, 2005**

**Investment Advisers Act of 1940**
**Release No. 2351 / February 9, 2005**

**Investment Company Act of 1940**
**Release No. 26752 / February 9, 2005**

**Admin. Proc. File No. 3-11814**

| | |
|---|---|
| In the Matter of<br><br>COLUMBIA MANAGEMENT ADVISORS, INC. AND COLUMBIA FUNDS DISTRIBUTOR, INC.,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940 |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), Section 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Columbia Funds Distributor, Inc. ("Columbia Distributor"); and that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against

Columbia Management Advisors, Inc. ("Columbia Advisors").

## II.

In anticipation of the institution of these proceedings, Columbia Advisors and Columbia Distributor each has submitted an Offer of Settlement (collectively, the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1. From at least 1998 through October 2003, Columbia Advisors and some of its predecessor entities (AColumbia Advisors@), the investment adviser to over 140 of the mutual funds in the Columbia mutual fund complex (the "Columbia Funds"), and Columbia Distributor, the principal underwriter and distributor of those funds, violated antifraud provisions of the securities laws by allowing certain preferred customers to engage in short-term or excessive trading, contrary to the restrictions and/or representations set forth in the Columbia Funds' prospectuses, that was detrimental to Columbia Funds but benefited respondents without disclosing these trading arrangements to fund shareholders or to fund trustees.

2. During this period, Columbia Distributor entered into arrangements with at least nine companies and individuals, allowing them to engage in frequent short-term trading in at least seven Columbia Funds, including international funds and a fund aimed at young investors. The aggregate trading that occurred totaled hundreds of millions of dollars. In some cases, Columbia Distributor required investors who wished to engage in frequent short-term trading in certain funds to place long-term or "sticky" assets in other funds. After entering into these arrangements, the nine companies and individuals engaged in frequent short-term or excessive trading in at least sixteen different Columbia Funds. In addition to trading made pursuant to these specific arrangements, Respondents allowed or failed to prevent hundreds of other accounts from engaging in a practice of short-term or excessive trading in a broad range of funds. They failed to prevent employees of their parent corporation, FleetBoston, and affiliated entities, from engaging in frequent trading in Columbia Funds through Fleet's 401(k) plan. Such short-term and excessive trading benefited Columbia Advisors and Columbia Distributor, by increasing management fees and distributor

compensation, but posed risks for investors in the funds in which short-term trading was allowed. In breach of its fiduciary duty, Columbia Advisors knew and approved of all but one of the short-term trading arrangements, and allowed the arrangements to continue.

3. Throughout the relevant period, the Respondents never disclosed to the long-term shareholders or to the independent trustees of the Columbia Funds the special arrangements they made with these short-term or excessive traders and the potential harm these arrangements posed to the relevant Columbia Funds. The Respondents also did not disclose the resulting conflicts of interest these arrangements created between Columbia Advisors and its clients.

4. Many of these arrangements and the trades made pursuant to them, as well trades that were the result of a practice of short-term and excessive trading Respondents allowed or did not prevent, were directly contrary to representations Respondents made in fund prospectuses that the funds did not permit short-term or excessive trading. In some other cases, the short-term trading pursuant to the arrangements and otherwise was contrary to prospectus representations that the funds in question would allow no more than three or four exchanges or telephone exchanges per fund per year.

5. By increasing assets under management, the trading arrangements increased the advisory fees earned by Columbia Advisors, and the trading arrangements increased the compensation paid to Columbia Distributor. By placing their own interest in generating compensation from short-term or excessive trading above the interests of long-term shareholders to whom this trading posed a risk of harm, and by failing to disclose these arrangements and trading and the conflicts of interest they created, Respondents engaged in fraudulent conduct and Respondent Columbia Advisors breached its fiduciary duty to act at all times in the best interests of the Columbia Funds' shareholders.

### Respondents

6. Columbia Advisors, an Oregon corporation, is a wholly-owned subsidiary of Columbia Management Group Inc., which during the relevant period was a wholly-owned subsidiary of Fleet National Bank, which was a subsidiary of FleetBoston Financial Corporation ("Fleet"). Fleet during that period was a publicly owned holding company traded on the New York Stock Exchange. Columbia Advisors has been an investment adviser registered with the Commission since 1969. In connection with its purchase of Liberty Financial Group ("Liberty") in November 2001, Fleet acquired various Liberty fund groups and investment advisers. In April 2003, most of these entities were merged with Fleet Investment Advisors Inc. into Columbia Advisors. Columbia Advisors serves as the investment adviser to approximately 140 mutual funds in the Columbia family of funds ("Columbia Funds"). Throughout the relevant time period, shares of Columbia Funds were continuously offered and sold to the public.

7. Columbia Distributor, a Massachusetts corporation, is a wholly-owned subsidiary of Columbia Management Group, Inc. Columbia Distributor has been a broker-dealer registered with the Commission since 1992. It acts as the principal underwriter and distributor for the Columbia Funds and certain other mutual funds. Before Fleet acquired Liberty in November 2001, the

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 26 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. Pro... Page 4 of 30

entity was known as Liberty Funds Distributor, Inc. ("Liberty Distributor").

**Facts**

**Introduction: The Prospectus Disclosures**

8. The Columbia Funds are a group of funds whose advisers are now controlled by Fleet. This group includes several funds (e.g., the Newport and Stein Roe fund groups) that were managed by subsidiaries of Liberty until late 2001, when certain management assets of Liberty were acquired by Fleet. By September 2003, the names of most of the fund groups managed by Fleet affiliates had been changed so that almost all were uniformly referred to by the name Columbia.

9. Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and can cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

10. During the relevant period, the Columbia Funds made certain prospectus disclosures relating to market timing. From 1998 through 2000, the prospectuses for some of the Columbia Funds contained disclosures stating that generally shareholders would be limited in the number of exchanges or telephone exchanges they could make during a given year.

11. In the Fall of 2000, a number of the Columbia Funds then advised by subsidiaries of Liberty began including in their respective prospectuses the following disclosure (the "Prohibition"):

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor=s opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

12. By the Spring of 2001, the rest of the Columbia Funds belonging to Liberty began including the Prohibition in their prospectuses. Columbia Advisors retained this disclosure language upon Fleet's acquisition of Liberty, and in early 2002, adopted the same disclosure for most of the funds that had been advised by subsidiaries of Fleet prior to the acquisition. In the Spring of 2003, Columbia Advisors amended the Prohibition language in certain of the prospectuses to make clear that other funds distributed by Columbia Distributor similarly reserved the right to reject trade requests from market timers or investors with a pattern of short-term or excessive trading.

Case 1:05-cv-10793-WGY     Document 14-2     Filed 06/14/2005     Page 27 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. Pro... Page 5 of 30

**Respondents Agreed to Allow Short-Term or Excessive Trading In
Columbia Funds**

13. During the period from at least 1998 until Summer 2003, Columbia
Distributor managers entered into at least nine arrangements with
investment advisers, hedge funds, brokers and individual investors allowing
them to engage in frequent trading in particular mutual funds. All but one
of these investors made multiple "round trips" per month (each round trip
consisting of a purchase and subsequent sale of some or all of the purchase
amount, or an exchange into the fund followed by an exchange out of the
fund of some or all of the initial exchange amount) and some made
hundreds of round trips during this approximately six-year period, resulting
in up to $142 million in assets at one time being present in the funds
pursuant to these arrangements, and in total round trip activity (purchases,
sales and exchanges) pursuant to these arrangements of over $5 billion.
Further, a substantial portion of this trading was directly contrary to the
prospectus disclosure for the funds in which it occurred.

**A. Ilytat Arrangement and Trading**

14. From April 2000 through October 2002, Ilytat, L.P., a San Francisco
hedge fund, and its affiliates ("Ilytat") made almost 350 round trips in
seven international Columbia Funds. A substantial number of these trades
were made pursuant to an arrangement with Columbia Distributor approved
by Columbia Advisors, which allowed Ilytat to engage in frequent and short-
term trading in the Newport Tiger Fund (the "Newport Tiger Fund"), an
Asian equity fund.

15. Through 2000 and early 2001, the prospectus for the Newport Tiger
Fund noted that "[s]hort-term 'market timers' who engage in frequent
purchases and redemptions can disrupt the Fund's investment program and
create additional transaction costs that are borne by all shareholders."
Starting in May 2001, the prospectus included the Prohibition
representation.

16. Notwithstanding the language in the prospectus, Columbia Distributor,
with the approval of the Newport Tiger Fund's portfolio manager, allowed
Ilytat, which it identified as a market timer, to enter into an arrangement
under which Ilytat was to place $20 million in the Newport Tiger Fund, with
two-thirds of that amount to remain static and one-third to be actively
traded. Neither the portfolio manager nor any other employee of Columbia
Advisors or Columbia Distributor conducted any analysis to determine
whether shareholders of the fund would be harmed by Ilytat's transactions.
According to internal calculations for the Newport Tiger Fund, Ilytat made
purchases or exchanges totaling over $133 million in the fund in 2000 and
redeemed $104 million. Further, during the first five months of 2001,
Ilytat's purchases or exchanges accounted for $72 million out of the $204
million in total purchases made by all investors in the Newport Tiger Fund.
During the same five-month period, Ilytat made redemptions totaling $60
million.

17. Beginning in October 2000, the portfolio manager for the Newport Tiger
Fund began to express concern about Ilytat's trading in the fund and
repeatedly wrote to the co-president of Columbia Distributor expressing his
concern about Ilytat=s trading activity and the harm that this trading

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 28 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. Pro...   Page 6 of 30

activity could cause to the fund and its investors. By June 2000, the head of Columbia Advisors became concerned that Ilytat appeared to be making weekly trades of $7 million in and out of the Newport Tiger Fund. Notwithstanding these concerns, Ilytat was allowed to continue trading in the Newport Tiger Fund until September 2002. During the 30 months from April 2000 to September 2002 during which it actively traded in the Newport Tiger Fund, Ilytat made almost 90 round trips in amounts of up to $13 million. This activity included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Prohibition representation.

18. From September 1998 through October 2003 Ilytat also traded extensively in multiple other Columbia funds, including the Acorn International Fund (making at least 73 round trips); the Acorn International Select Fund (making at least 60 round trips); the Stein Roe International Fund (making over 80 round trips in a three-month period); the Newport International Equity Fund (making approximately 19 round trips during a five-month period) and the Columbia International Equity Fund (making at least 10 round trips). Over 50 of the round trips in these funds took place after the funds had adopted the Prohibition.

## B. Ritchie Arrangement and Trading

19. From January 2000 through September 2003, Ritchie Capital Management, Inc. ("Ritchie"), a hedge fund manager, traded frequently in two Columbia Funds: the Newport Tiger Fund (during January 2000 through October 2002) and the Columbia Growth Stock Fund (formerly the Stein Roe Advisor Growth Stock Fund) ("Growth Stock Fund"), a large cap fund, during June 2002 through September 2003.

20. Ritchie made most of its trades in the Newport Tiger Fund. During the period from January 2000 through April 2001, notwithstanding the language in the fund's prospectus (set forth in paragraph 15 above) regarding the potential harm caused by short-term market timers, Ritchie made over 150 round trips. In addition, from May 2001 through September 2002, Ritchie made over 100 trades in the Newport Tiger Fund even though the prospectus included the Prohibition representation during this period.

21. In 2001, a Senior Vice President of Columbia Distributor met with Ritchie=s principals and discussed the possibility of Ritchie placing Along-term@ assets in a fixed income fund Ato offset their activity in Tiger." At the time, Ritchie's $52 million position in the Newport Tiger Fund accounted for nearly 10% of the fund's $525 million in assets.

22. In early 2002, Ritchie began negotiating with Columbia Distributor an arrangement to actively trade the Growth Stock Fund, which by then included the Prohibition disclosure in its prospectus. Ritchie=s initial proposal was to place up to $200 million in the fund (which at that time had a total asset value of approximately $776 million), with the ability to trade up to half of that amount every day. Columbia Distributor countered with a proposal to keep 90% of the investment in place for 90 days, with no limit on trades of the remaining 10%. Columbia Advisors= portfolio manager for the fund was aware of these negotiations and supported Ritchie's proposal. In June 2002, Ritchie began trading in the Growth Stock fund, making five round trips in two months in amounts of up to $7 million.

Case 1:05-cv-10793-WGY　　Document 14-2　　Filed 06/14/2005　　Page 29 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. Pro...　Page 7 of 30

23. In early 2003, Ritchie entered into a "sticky-asset" arrangement with Columbia Distributor under which it agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with no limits on the number of trades per month, and place another $10 million in the Columbia Short Term Bond Fund as a Astatic@ (non-trading) asset. The portfolio manager for the Growth Stock Fund approved the arrangement, and the co-president of Columbia Distributor knew of and acquiesced in it. Neither the portfolio manager nor any other employee of Columbia Advisors or Columbia Distributor conducted any analysis to determine whether shareholders of these funds would be harmed by the transactions. Overall, pursuant to its arrangements with Columbia Distributor and contrary to Columbia Advisors' Prohibition representation in the fund's prospectus, Ritchie made approximately 18 round trips in the Growth Stock Fund from June 2002 through September 2003.

### C. Stern Arrangements and Trading

24. During late 2002 and early 2003, entities controlled by Edward Stern ("Stern") negotiated trading arrangements with Columbia Distributor through two intermediaries. In early 2003, Epic Advisors, on behalf of Stern=s Canary Investment Management firm, entered into an arrangement with Columbia Distributor, approved by its National Sales Manager, under which Stern entities agreed to make investments in three funds (the Columbia Growth & Income Fund, the Columbia Select Value Fund, and the Growth Stock Fund), totaling $37 million. Despite the fact that Columbia Advisors had included the Prohibition disclosure in the prospectus for each of these three funds, the arrangement permitted Stern entities to make three round trips per month in each fund. Stern was permitted to make one or two round trips in each account in March and early April. Thereafter, no more orders were received and Columbia Advisors placed "stops" on the accounts which prevented further trading in the accounts.

25. In late 2002 or early 2003, Stern also entered into an arrangement with Columbia Distributor pursuant to which he placed $5 million in the Columbia High Yield Fund (the "High Yield Fund"), a high-yield bond fund. Despite the fact that Columbia Advisors had included the Prohibition disclosure in the prospectus for the High Yield Fund, Stern was permitted to make one round trip each month in the fund. The portfolio manager for the High Yield Fund approved the arrangement. During the period from November 2002 through July 2003, Stern made seven round trips in an average amount of $2.5 million.

### D. Calugar Arrangement and Trading

26. In or around April 1999, Daniel Calugar ("Calugar") reached an arrangement with Columbia Distributor allowing him to place up to $50 million in the Columbia Young Investor Fund ("Young Investor Fund"), a fund targeting investments by children with an "educational objective to teach children about mutual funds," and the Growth Stock Fund, with permission to make one round trip per month using his entire position. The portfolio manager for the Growth Stock Fund, as well as Columbia Distributor's Managing Director of National Accounts and one of its Senior Vice Presidents, approved the arrangement. Neither the portfolio manager nor any other employee of Columbia Advisors or Columbia Distributor

Case 1:05-cv-10793-WGY     Document 14-2     Filed 06/14/2005     Page 30 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. Pro... Page 8 of 30

conducted any analysis to determine whether shareholders of these funds would be harmed by Calugar's transactions.

27. In 2000, Calugar, on average, made more than one round trip every trading day in various of the Columbia Funds. Throughout the year, Calugar made over 200 round trips in the Young Investor Fund, placing trades of up to $2.3 million at a time, and during the four-month period from January 2000 through April 2000, he also made at least 13 round trips in the Stein Roe International Fund.

28. During the period from January 2000 through February 2001, Calugar also made nearly 70 round trips in the Growth Stock Fund, placing trades of up to $4 million at a time. Throughout 2000 and into January 2001, he also made approximately 20 round trips in the Newport International Equity Fund, in amounts of up to $6.6 million.

## E. Giacalone Arrangement and Trading

29. In late 2000, Columbia Distributor, with the approval of its Co-President, entered into a "sticky-asset" arrangement with Sal Giacalone ("Giacalone"). Under the arrangement, which was approved by the head of the Newport Fund Group at the time, Giacalone was allowed to make four round trips per month of up to $15 million in the Newport Tiger fund. In return, Giacalone was required to place $5 million in Along term assets@ in Acorn Funds. Neither the head of the Newport Fund Group nor any other employee of Columbia Advisors or Columbia Distributor conducted any analysis to determine whether shareholders of the fund would be harmed by Giacalone's transactions.

30. Notwithstanding the supposed terms of his arrangement and the language in the prospectus discussing the potential harm caused by short-term market timers, Giacalone made a total of 43 round trips in the Newport Tiger Fund during six months of trading from November 2000 through April 2001. During the first two months of 2001 alone, Giacalone made at least 30 round trips in amounts of up to $4.7 million.

## F. D.R. Loeser Arrangement and Trading

31. In late 1998, Columbia Distributor entered into an arrangement with D. R. Loeser ("Loeser"), a registered investment adviser, allowing Loeser to make five round trips per month of up to $8 million in the Growth Stock Fund. A Senior Vice President of Columbia Distributor, the President of the Stein Roe fund complex, which managed the Growth Stock Fund at that time, and the Growth Stock Fund portfolio manager all approved this arrangement. Neither these individuals, nor any other employee of Columbia Advisors or Columbia Distributor conducted any analysis to determine whether shareholders of the fund would be harmed by Loeser's trading.

32. During the first five months of 2000, Loeser made approximately 20 round trips in the Growth Stock Fund and another 20 round trips in the Young Investor Fund.

## G. Signalert Arrangement and Trading

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 31 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. Pro... Page 9 of 30

33. Beginning in 1999, Signalert, a registered investment adviser, began trading in Columbia Funds under arrangements with Columbia Distributor. Initially, Signalert was allowed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund, with the ability to make up to 10 round trips annually in each of these two funds. Under the arrangement, Signalert was also to place $5 million in each of six other funds, trading just once a quarter.

34. Columbia Distributor senior management later sought to increase the size of Signalert's investments. In late 1999, as part of a "sticky-asset" arrangement, Signalert agreed to place an additional $10 million in the Growth Stock and Young Investor funds, and to invest and maintain other assets in a money market fund, thereby allowing Columbia Advisors to generate a management fee from those assets. In return, Columbia Distributor allowed Signalert to make up to 12 round trips per year in each fund. The portfolio manager for the Growth Stock Fund, who was also the co-manager for the Young Investor Fund, approved this arrangement. Neither the portfolio manager nor any other employee of Columbia Advisors or Columbia Distributor conducted any analysis to determine whether shareholders of these funds would be harmed by Signalert's trading.

35. During the first 11 months of 2000, notwithstanding the supposed terms of the arrangement, Signalert made over 60 round trips in the two funds, one every one to two weeks. Overall, during the period 2000-2001, Signalert made more than 50 round trips in the Growth Stock Fund and approximately 50 round trips in the Young Investor Fund. Moreover, as of February 2001, Columbia Advisors had represented by way of the Prohibition disclosures in the prospectuses for these funds that short-term or excessive trading would not be permitted. Yet, from February 2001 through August 2001, Signalert made 20 round trips in the Young Investor Fund. It also made over 20 round trips in the Growth Stock Fund from February 2001 through December 2001.

36. Signalert also began trading in four additional funds: the Stein Roe Income Fund (a bond fund), the Acorn Fund (a small to mid cap fund), the Galaxy Equity Value Fund (a large cap fund), and the Galaxy Growth & Income Fund. Despite the fact that the Stein Roe Income Fund and the Acorn Fund each included the Prohibition representation in their prospectuses, Signalert made eight round trips in the Stein Roe Income Fund, all in the month of November 2001, and at least 15 round trips in the Acorn Fund during the period from March 2001 through February 2003. In addition, notwithstanding the fact that the two Galaxy funds generally limited investors to three exchanges per year, Signalert made approximately 23 round trips in the Galaxy Equity Value Fund and more than 25 round trips in the Galaxy Growth & Income Fund in a period of less than a year, from February 2001 through January 2002.

## H. Waldbaum Arrangement and Trading

37. During late 2002, Columbia Distributor entered into a "sticky-asset" arrangement with American Express, which was acting on behalf of investor Alan Waldbaum ("Waldbaum"). Under the arrangement, his account was allowed to make 10 round trips per year in the Columbia Tax Exempt Fund ("Tax Exempt Fund"), a municipal bond fund, if he moved less than $5 million each time and always kept $2 million in the fund. The arrangement

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 32 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 10 of 30

was approved by the portfolio manager for the Tax Exempt Fund.

38. At the time, the prospectus for the Tax Exempt Fund included Columbia Advisors' Prohibition representation. Notwithstanding this representation, Waldbaum made 10 round trips in the Tax Exempt fund from November 2002 through October 2003.

## I. Tandem Arrangement and Trading

39. By early 2000, Tandem Financial ("Tandem"), an investment adviser, entered into an arrangement with Columbia Distributor, which was approved by its Senior Vice President. The arrangement permitted Tandem to make an unlimited number of trades in one or more of the Columbia Funds. Overall, pursuant to this arrangement, during the period from February 2000 through September 2003, Tandem made more than 100 round trips in the Tax Exempt Fund.

40. During 2000, Tandem made approximately eleven round trips in the Tax-Exempt Fund. Starting in April 2001, the prospectus for the Tax Exempt Fund prospectus included the Prohibition disclosure. Despite the disclosure, Tandem made 106 round trips during the period from April 2001 through September 2003.

### Other Trading

41. From January 1998 to October 2003, the number of purchases matched with sales in accounts trading in the Columbia Funds totaled over 44,000 matches. During this period, thousands of non-omnibus accounts made two or more round trips in the Columbia Funds in amounts of $100,000 or more. Approximately 270 of these accounts each made over 21 round trips. In the non-omnibus accounts, there were altogether over 22,300 round trips during the period and the omnibus accounts also made numerous round trips.

### Respondents Failed to Disclose the Frequent or Excessive Trading Arrangements

42. Several Columbia Advisors portfolio managers (including those for the Growth Stock Fund, the Newport Tiger Fund, the High Yield Fund, the Young Investor Fund, and the Tax Exempt Fund, one of whom was also the Chief Investment Officer for International Equities), knew of and acquiesced in one or more of the arrangements described above, allowing excessive or short-term trading of their own funds, even though these arrangements were often contrary to the express representations in the funds= prospectuses. In addition, the senior executive at a predecessor to Columbia Advisors responsible for the predecessor's advisory activity during the period from 1998 through late 2001 was aware of at least one of these arrangements.

43. Respondents never disclosed to investors or to the independent trustees of the Columbia Funds the arrangements described above or the trading in the funds that took place pursuant to the arrangements.

### Respondents Knew That Short-Term or Excessive Trading Harmed

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 33 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...   Page 11 of 30

### or Created a Risk of Harm to the Funds

44. Some of the Columbia Funds' portfolio managers and a number of Columbia Distributor senior executives and senior executives responsible for Columbia Advisors' advisory activity during the period from 1998 to 2003, knew that short-term or excessive trading caused potential or actual harm and disruption to the Columbia Funds. For example:

a. By the beginning of 2000, a Senior Vice President of Columbia Distributor expressed concern about the potentially harmful effect that Calugar's frequent trading was having on the relevant Columbia Funds.

b. In the Spring of 2000, shortly after the peak of Calugar=s trading in the Stein Roe International Fund, the fund=s liaison with Columbia Distributor sent an e-mail to the head of Columbia Advisors and Co-President of Columbia Distributor with a chart that he summarized as showing: "for the last 6 weeks . . . $142,018,026 has gone into the Fund and $134,935,372 has gone out. . . .These figures exceed the total size of the Fund!" He continued, "My goal here is to increase awareness of the magnitude of this problem and to get everyone involved working on a solution on a timely basis."

c. In October 2000, in an e-mail discussing Ilytat, the portfolio manager for the Newport Tiger Fund complained about market timers to the head of Columbia Advisors and the Co-President of Columbia Distributor, stating : "Their active trading has increased and it has become unbearable. There will be long term damage to the fund." He further noted, "Let=s understand that they [timers] really are not investors. They take advantage of the fund=s delayed pricing mechanism which almost guarantees a risk free return . . . I hope wholesalers understand that by accepting a flipper=s [i.e., a short-term trader's] investment they do damage to the fund=s performance, tax status, and the other shareholders (their clients)."

d. In March 2001, in another e-mail sent to the head of Columbia Advisors and to the Co-President of Columbia Distributor, the Tiger Fund portfolio manager stated that "Newport. . .and the fund=s long-term shareholders are all negatively impacted by flippers." He suggested that action be taken. The portfolio manager spoke directly with the head of Columbia Advisors and the Co-President of Columbia Distributor about market timing issues, including his concerns about the negative impact on his funds that frequent movements of large amounts of cash in and out of the fund could have, making it difficult to manage the funds.

e. In September 2002, the Funds' transfer agent reported to a Managing Director of Columbia Distributor that, "Despite the tools currently available to us, timers continue to disrupt fund performance and management as well as exaggerate sales figures."

45. In November 2002, the boards of trustees of funds managed by Wanger Asset Management, L.P., a subsidiary of Columbia Management Group, approved the implementation of a 2% redemption fee in connection

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 34 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 12 of 30

with its international funds. In December 2002, the board of trustees of funds managed by Columbia Advisors approved the implementation of a 2% redemption fee in connection with its international funds. The redemption fees were designed to curb frequent trading activities in the funds.

46. On January 31, 2003 a senior executive of Columbia Advisors sent an e-mail to the executive who headed the entity responsible for monitoring fund trading, stating: "I found out a week ago, in casual conversation . . . that severer[sic] Fleet employees who use the international funds in our own 401k arb the fund. FYI." He advised one Fleet employee to cease such trading. The executive who received this information was also a director of Columbia Distributor, an officer of Columbia Advisors and a trustee of several Columbia Funds. Neither the executive nor any other individual at Columbia Advisors, Columbia Distributor, or their affiliates took any action to investigate or halt such trading in shares held in the 401(k) plan. In February 2003, Columbia international funds began imposing a 2% redemption fee. After February, 2003, Liberty International Equity Fund was no longer in the Fleet 401(k) plan.

47. Notwithstanding the concerns raised about the impact this excessive or short-term trading was having on the relevant Columbia Funds, Columbia Advisors and Columbia Distributor continued to allow, and/or failed to prevent, such trading.

**Columbia Distributor Interfered With Efforts to Halt Short-Term or Excessive Trading**

48. Columbia Distributor recognized its obligation to act consistently with fund disclosure prohibiting short-term or excessive trading, and professed to want to prevent short-term or excessive traders from investing in the Columbia Funds. In fact, however, in connection with the arrangements referenced above, on multiple occasions, Columbia Distributor executives and employees blocked efforts to halt their clients= trading activity. For example:

   a.  In 2000, a Columbia Distributor sales executive halted efforts to stop Giacalone from making almost daily round trips in the Newport Tiger Fund. Although the Giacalone accounts were subsequently shut down, Columbia Distributor=s interference delayed the process and allowed a substantial number of additional trades to be made.

   b.  In March 2001, a Senior Vice President of Columbia Distributor intervened when a portfolio assistant to the Acorn International Fund attempted to stop Ilytat from violating the fund=s short-term trading policy. The Columbia Distributor executive caused a manager to telephone the portfolio assistant and tell her that it was "inappropriate" for her to take any direct steps to halt Ilytat=s trading.

   c.  By the end of March 2001, with the acquiescence of a Senior Vice President of Columbia Distributor, Ilytat had been placed on a list of "Authorized Accounts for Frequent Trading," a list of accounts maintained by the transfer agent for the Columbia Funds, against which no action was to be taken, however frequent their trading.

Case 1:05-cv-10793-WGY     Document 14-2     Filed 06/14/2005     Page 35 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...   Page 13 of 30

   d. In December 2001, a Senior Vice President of Columbia Distributor intervened when the portfolio manager for Acorn International Fund complained about Ilytat=s market timing adversely impacting her fund and tried to halt it. After he spoke to the fund's management, they agreed that Ilytat would be allowed to unwind its position by trading one-third of its current balance three to four times per year.

   e. In 2002, Columbia Distributor=s Managing Director for National Accounts personally intervened to reverse stops placed on Ilytat=s trading by market timing surveillance personnel. Ilytat continued trading for almost three more months thereafter.

   f. In January 2003, a Columbia Distributor sales manager insisted that no restrictions be placed on trading by Waldbaum because of the trading arrangement with him.

   g. In early 2003, a sales manager at Columbia Distributor intervened when the Funds' transfer agent sought to block Tandem from placing any more trades in shares of the Tax-Exempt Fund. She wrote to the transfer agent's market surveillance manager, "Tandem Fin=l . . . are [sic] an advisor that we have a very close relationship with. We definitely do not want to restrict them," and further stated that "there are certain relationships like Tandem that are allowed to time based on prior discussions." As a result of this intervention, Tandem was allowed to continue trading in the Tax Exempt Fund through October 2003.

   h. In March 2003, a Columbia Distributor executive intervened to allow Signalert to trade in the Columbia High Yield fund, despite a previous bar for excessive trading.

### Columbia Advisors and Columbia Distributor Benefited From Short-Term or Excessive Trading

49. Both Columbia Advisors and Columbia Distributor benefited directly from the short-term trading arrangements. Because Columbia Advisors received advisory fees based on the total assets under management in the funds for which it acted as adviser, it served Columbia Advisors= financial interest to obtain the largest possible investment in a fund. Indeed, in an e-mail in 2000, a Managing Director of Columbia Distributor set forth certain guidelines for entering short-term trading arrangements requiring, inter alia, that the investor place non-trading assets in Columbia Funds, to ensure "a constant management fee income."

50. Columbia Distributor earned revenue and its executives were compensated in whole or in part based on the total amount of assets they caused to be invested in the funds. As a result, it was also in Columbia Distributor's financial interest to do what was necessary to persuade short-term traders to place money in the funds.

### Columbia Advisors and Columbia Distributors Provided Material Non-Public Portfolio Information to Traders

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 36 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 14 of 30

51. Columbia Advisors generally maintained as confidential information concerning the specific securities owned by Columbia funds, and their weighted value. Except at semi-annual intervals, Columbia did not disclose this information to the public. In a February 2002 e-mail, sent to an individual identified by Fleet as an employee of its Denver call center, a member of Columbia's compliance department stated that "it is our policy not to provide information on fund holdings to individual shareholders or potential investors unless it is information that we have already made public." However, Columbia Advisors through portfolio managers and Columbia Distributor, with the approval of senior managers, provided material non-public portfolio holdings information to various entities. One of the entities that received non-public portfolio holdings information was Ilytat. From at least August 2000 through at least July 2002, it received such non-public portfolio holdings information for at least eight funds. Knowledge of Columbia's portfolio holdings would enable Ilytat or others to engage in hedge transactions involving a fund and the underlying securities it held. In response to a written inquiry from the Commission's Office of Compliance Inspection and Examinations in September 2003, a senior executive of Columbia Advisors represented in writing that "We have not yet identified any deviations from policies as applied to the transmission of non-public information with respect to a Fund's portfolio holdings." In January 2004, Columbia Advisors informed the Commission staff that Columbia Advisors and Columbia Distributor had transmitted non-public fund portfolio holdings information. Between January and July 2004, Columbia Advisors and Columbia Distributor supplemented that response with additional information about transmittals of non-public portfolio holdings information of certain funds to Ilytat and others.

52. Senior executives of Columbia Advisors and Columbia Distributor were aware that these entities did not have a consistent policy or practice with respect to disclosure of fund portfolio holdings and related information. In late 2001, Columbia's legal department expressed concern about the practice of portfolio holdings disclosure. Columbia Distributor managers continued to provide such information, but agreed to follow the legal department's recommendation to provide the following language if such information was disclosed: "By accepting this information, you acknowledge that it is provided to you on a confidential basis and is not to be distributed to any shareholder of the funds or to any person other than the recipient and is not to be used for any purpose other than the purpose you have expressly discussed with us." However, on multiple occasions after that agreement, non-public portfolio holdings information was provided without such language.

### Violations

53. As a result of the conduct described in Section III above, Columbia Advisors willfully violated Sections 206(1) and 206(2) of the Advisers Acts in that Columbia Advisors, while acting as an investment adviser, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, Columbia Advisors permitted short-term and excessive trading, contrary to the prospectus disclosure for the funds traded. In addition, Columbia Advisors breached its fiduciary duty to the Funds when it failed to disclose to the fund boards or shareholders the conflicts of interest created

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 37 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 15 of 30

when it placed its own interest in accepting market timing money to generate fees above the interests of long-term shareholders, who were harmed by market timing.

54. As a result of the conduct described in Section III above, Columbia Distributor willfully aided and abetted and caused Columbia Advisors' violations of Sections 206(1) and 206(2) of the Advisers Act. Columbia Distributor knew or was reckless in not knowing that its negotiation of arrangements allowing short-term or excessive trading would aid and abet or contribute to Columbia Advisors' violations by rendering the fund prospectuses issued by Columbia Advisors materially misleading, and would cause Columbia Advisors to breach its fiduciary duty to act in the interest of fund shareholders.

55. As a result of the conduct described in Section III above, Columbia Advisors and Columbia Distributor willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, in that, while acting as principals, they participated in and effected transactions in connection with joint arrangements in which the funds were participants without filing an application with the Commission and obtaining a Commission order approving the transactions. These provisions are designed to prevent abuses arising from conflicts of interest between an investment company and any affiliated person of the investment company. As an affiliated person and as the principal underwriter, respectively, of the Columbia Funds, which are registered investment companies, Columbia Advisors and Columbia Distributor effected transactions in which they were joint participants with the Funds. They caused certain Funds to enter into joint transactions whereby some funds agreed to accept market timing investments (to their detriment) in return for the placement of long-term assets in other affiliated funds. The Funds' participation in the market timing arrangements was on a basis less advantageous than Respondents' participation, because Columbia Advisors earned fees and Columbia Distributor received payments for "sticky" money placed in non-timed funds, in exchange for allowing timing activity in other funds that could be harmful to those funds. The funds in which timing activity was allowed received no benefit from these "sticky asset" arrangements. Respondents failed to obtain an exemptive order from the Commission for these joint transactions, as required by Rule 17d-1.

56. As a result of the conduct described in Section III above, Columbia Advisors willfully violated, and Columbia Distributor willfully aided and abetted and caused violations of, Section 34(b) of the Investment Company Act. Columbia Advisors made untrue statements of a material fact or omitted to state facts necessary in order to prevent statements made, in the light of the circumstances under which they were made, from being materially misleading in registration statements or other documents filed with the Commission. From 2001, Columbia's prospectuses included the statement that "The Fund does not permit short-term or excessive trading in its shares." These prospectuses were materially misleading. Columbia Advisors prepared and repeatedly filed the materially misleading registration statements and prospectuses with the Commission. Columbia Distributor aided and abetted Columbia Advisors' violations of Section 34(b) in that it knew that the statements filed with the Commission were inaccurate and failed to correct those statements, allowing further misleading filings to be made.

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 38 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 16 of 30

57. As a result of the conduct described in Section III above, Columbia Advisors willfully violated Section 204A of the Advisers Act in that it, while acting as an investment adviser, failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse of material, nonpublic information by such investment adviser or any person associated with such investment adviser, by releasing material, nonpublic information concerning the funds' portfolio holdings to one or more timers in the funds.

58. As a result of the conduct described in Section III above, Columbia Distributor willfully violated Section 17(a) of the Securities Act, in that it directly and indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) acting knowingly or recklessly, employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon purchasers of the securities. Columbia Distributor offered and sold shares of the Columbia Funds using prospectuses that contained materially misleading statements. As discussed above, a number of Columbia Distributor's senior executives knew of and participated in arrangements under which Columbia Funds allowed certain shareholders to engage in short-term and excessive trading. They knew or were reckless in not knowing that these arrangements were not disclosed in the prospectuses for the funds, and, in or after 2001, that the arrangements were directly contrary to the fund prospectus disclosure, which represented that the funds did not permit short-term or excessive trading.

59. As a result of the conduct described in Section III above and specifically the conduct described in paragraph 58 above, Columbia Distributor willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, in that it directly or indirectly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon certain persons.

60. As a result of the conduct described in Section III above, Columbia Distributor willfully violated Section 15(c) of the Exchange Act, by effecting transactions in, or inducing or attempting to induce, the purchase or sale of securities (other than on a national securities exchange of which it was a member) by means of a manipulative, deceptive, or other fraudulent device or contrivance.

### Certain Remedial Efforts and Undertakings

61. In determining to accept the Offers, the Commission considered the

following[2] efforts voluntarily undertaken by the Columbia Funds:

a.  Within 90 days of the date of this Order, the Columbia Funds will operate in accordance with the following governance policies and practices:

   i.  No more than 25% of the members of the board of trustees of any Columbia Fund will be persons who either: (A) were directors, officers or employees of any respondent named in this Order or the Bank of America Order, or any successor entity, at any point during the preceding 10 years; or (B) are interested persons, as defined in the Investment Company Act, of the Fund or of any respondent named in this Order or the Bank of America Order. In the event that the board of trustees fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent trustee, the independent trustees will take such steps as may be necessary to bring the board in compliance within a reasonable period of time;

   ii.  No chairman of the board of trustees of any Columbia Fund will either: (A) have been a director, officer or employee of any respondent named in this Order or the Bank of America Order, or any successor entity, during the preceding 10 years; or (B) be an interested person, as defined in the Investment Company Act, of the Fund or of any respondent named in this Order or the Bank of America Order, or any successor entity; and

   iii.  Any person who acts as counsel to the independent trustees of any Columbia Fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act and will not have any employment, consultant, attorney-client, auditing or other professional relationship with any respondent named in this Order; with Banc of America Capital Management, LLC or BACAP Distributors, LLC; or with any successor entity to any of those entities.

b.  No action will be taken by the board of trustees of any Columbia Fund or by any committee thereof unless such action is approved by a majority of the members of the board of trustees or of such committee, as the case may be, who are neither: (i) persons who were directors, officers or employees of any respondent named in this Order or in the Bank of America Order, or any successor entity, at any point during the preceding 10 years; or (ii) interested persons, as defined in the Investment Company Act, of the Fund or of any respondent named in this Order or in the Bank of America Order, or any successor entity. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent trustees of a fund is not approved by the full Board of Trustees, the fund will disclose such proposal and the related board vote in its shareholder report for such period.

c.  Commencing in 2005 and not less than every fifth calendar year thereafter, each Columbia Fund will hold a meeting of shareholders at which the board of trustees will be elected.

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 40 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 18 of 30

d. Each of the Columbia Funds will designate an independent compliance officer reporting to its board of trustees as being responsible for assisting the board of trustees and any of its committees in monitoring compliance by Respondents and their successor entities with the federal securities laws, those entities' fiduciary duties to fund shareholders and the Code of Ethics in all matters relevant to the operation of the Columbia Funds. The duties of this person will include reviewing all compliance reports furnished to the board of trustees or its committees by Columbia-affiliated entities, attending meetings of Columbia Advisors' Internal Compliance Controls Committee and of Columbia Distributor's Internal Compliance Controls Committee to be established pursuant to Respondents' undertakings set forth in Section IV below, serving as liaison between the board of trustees and its committees and the chief compliance officer of Columbia-affiliated entities, making such recommendations to the board of trustees regarding respondents' and successor entities' compliance procedures as may appear advisable from time to time, and promptly reporting to the board of trustees any material breach of fiduciary duty, breach of the Code of Ethics and/or violation of the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties.

62. In determining to accept the Offers, the Commission further considered the following undertakings by Respondents: Ongoing Cooperation: Respondents shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, Respondents have undertaken:

a. To produce promptly, without service of a notice or subpoena, any and all documents and other information requested by the Commission's staff;

b. To use their best efforts to cause their employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

c. To use their best efforts to cause their employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff, at such times as the staff reasonably may direct; and

d. That in connection with any testimony of Respondents to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, Respondents:

   i. Agree that any such notice or subpoena for Respondents' appearance and testimony may be served by regular mail on their attorneys, Bingham McCutchen, LLP, 150 Federal Street, Boston, Massachusetts 02110-1726, att'n: Steven W. Hansen, Esq.; and

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 41 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...   Page 19 of 30

    ii. Agree that any such notice or subpoena for Respondents' appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

63. Compliance and Oversight Structure. Respondent Columbia Advisors shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

    a. Columbia Advisors shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the Columbia Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior executives of Columbia Advisors. Columbia Advisors shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. Columbia Advisors shall report on issues arising under the Code of Ethics to the extent relating to fund business, including all violations thereof, to the Compliance or Audit Committee of the pertinent Board of Trustees of the Columbia Funds advised by Columbia Advisors with such frequency as the Compliance or Audit Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly.

    b. Columbia Advisors shall establish an Internal Compliance Controls Committee to be chaired by its chief compliance officer, which Committee shall have as its members senior executives of Columbia Advisors. Notice of all meetings of the Internal Compliance Controls Committee shall be given to the independent compliance officer of the trustees of the Columbia Funds advised by Columbia Advisors, who shall be invited to attend and participate in such meetings. The Internal Compliance Controls Committee for Columbia Advisors shall review compliance issues throughout the business of Columbia Advisors, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Compliance or Audit Committee of the boards of trustees of the Columbia Funds advised by Columbia Advisors with such frequency as the independent trustees of such funds may instruct, and in any event at least quarterly. Columbia Advisors shall also provide to the Board of Directors of Columbia Advisors or any successor entity the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Compliance or Audit Committee of the Columbia Funds advised by Columbia Advisors.

Case 1:05-cv-10793-WGY   Document 14-2   Filed 06/14/2005   Page 42 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...   Page 20 of 30

    c. Columbia Advisors shall at its own expense establish and staff a full-time senior- level position whose responsibilities shall include compliance matters related to conflicts of interests. This officer will report directly to the chief compliance officer of Columbia Advisors.

    d. Columbia Advisors shall require that its chief compliance officer or a member of his or her staff shall review compliance with the policies and procedures established to address compliance issues under the Securities Act, Exchange Act, Investment Advisers Act and Investment Company Act and that any violations be reported to the Internal Compliance Controls Committee.

    e. Columbia Advisors shall require that its chief compliance officer report to the independent trustees of the Columbia Funds advised by Columbia Advisors any breach of fiduciary duty and/or the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent trustees may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable trustee) shall be reported promptly.

    f. Columbia Advisors shall establish a corporate ombudsman to whom employees may convey concerns about Columbia business matters that they believe implicate matters of ethics or questionable practices. Columbia Advisors shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent trustees of the Columbia Funds advised by Columbia Advisors. Columbia Advisors shall also review matters to the extent relating to fund business brought to the attention of the ombudsman, along with any resolution of such matters, with the independent trustees of the Columbia Funds advised by Columbia Advisors with such frequency as the independent trustees of such funds may instruct.

64. Respondent Columbia Distributor shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

    a. Columbia Distributor shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the Columbia Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior executives of Columbia Distributor. Columbia Distributor shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 43 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 21 of 30

review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. Columbia Distributor shall report on issues arising under the Code of Ethics to the extent relating to fund business, including all violations thereof, to the Compliance or Audit Committee of the pertinent Board of Trustees of any fund distributed by Columbia Distributor with such frequency as the Compliance or Audit Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly.

b.  Columbia Distributor shall establish an Internal Compliance Controls Committee to be chaired by its chief compliance officer, which Committee shall have as its members senior executives of Columbia Distributor. Notice of all meetings of the Internal Compliance Controls Committee shall be given to the independent compliance officer of the trustees of the funds distributed by Columbia Distributor, who shall be invited to attend and participate in such meetings. The Internal Compliance Controls Committee for Columbia Distributor shall review compliance issues throughout the business of Columbia Distributor, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Compliance or Audit Committee of the trustees of the funds distributed by Columbia Distributor with such frequency as the independent trustees of such funds may instruct, and in any event at least quarterly. Columbia Distributor shall also provide to the Board of Directors of Columbia Distributor or any successor entity the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Compliance or Audit Committee of the funds distributed by Columbia Distributor.

c.  Columbia Distributor shall at its own expense establish and staff a full-time senior-level position whose responsibilities shall include compliance matters related to conflicts of interests. This officer will report directly to the chief compliance officer of Columbia Distributor.

d.  Columbia Distributor shall require that Columbia's chief compliance officer or a member of his or her staff review compliance with the policies and procedures established to address compliance issues under the Securities Act, Exchange Act, Investment Advisers Act and Investment Company Act and that any violations be reported to the Internal Compliance Controls Committee.

e.  Columbia Distributor shall require that its chief compliance officer report to the independent trustees of the funds distributed by Columbia Distributor any breach of fiduciary duty and/or the federal securities laws of

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 44 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 22 of 30

which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent trustees may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable trustee) shall be reported promptly.

f. Columbia Distributor shall establish a corporate ombudsman to whom employees may convey concerns about Columbia business matters that they believe implicate matters of ethics or questionable practices. Columbia Distributor shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent trustees of the Columbia Funds. Columbia Distributor shall also review matters to the extent relating to fund business brought to the attention of the ombudsman, along with any resolution of such matters, with the independent trustees of the funds distributed by Columbia Distributor with such frequency as the independent trustees of such funds may instruct.

65. Independent Compliance Consultants.

a. Respondent Columbia Advisors shall retain, within 30 days of the date of entry of the Order, the services of an Independent Compliance Consultant ("the Adviser Consultant") not unacceptable to the staff of the Commission and a majority of the independent trustees of the Columbia Funds advised by Columbia Advisors. The Adviser Consultant's compensation and expenses shall be borne exclusively by Respondent. Respondent shall require the Adviser Consultant to conduct a comprehensive review of Respondent's supervisory, compliance, and other policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Respondent and its employees. This review shall include, but shall not be limited to, a review of Respondent's market timing and late trading controls across all areas of its business, a review of the pricing practices of the Columbia Funds advised by Columbia Advisors that may make those funds vulnerable to market timing, a review of the utilization by the Columbia Funds advised by Columbia Advisors of short-term trading fees and other controls for deterring excessive short-term trading, a review of possible governance changes in the boards of the Columbia Funds advised by Columbia Advisors to include committees organized by market sector or other criteria so as to improve compliance, and a review of Respondent's policies and procedures concerning conflicts of interest,

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 45 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 23 of 30

including conflicts arising from advisory services to multiple clients. Respondent shall require the Adviser Consultant also to review Respondent's policies and procedures concerning provision of non-public information relating to fund portfolio holdings and weighted value. Respondent shall cooperate fully with the Adviser Consultant and shall provide the Adviser Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

b. Respondent Columbia Distributor shall retain, within 30 days of the date of entry of the Order, the services of an Independent Compliance Consultant ("the Distributor Consultant") not unacceptable to the staff of the Commission and the majority of the independent trustees of the funds distributed by Columbia Distributor. The Distributor Consultant's compensation and expenses shall be borne exclusively by Respondent. Respondent shall require the Distributor Consultant to conduct a comprehensive review of Respondent's sales practices, supervisory, compliance, and other policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty, breaches of the Codes of Ethics and federal securities law violations by Respondent and its employees. The Respondent shall require the Distributor Consultant also to review Respondent's policies and procedures concerning provision of non-public information relating to fund portfolio holdings and weighted value. Respondent shall cooperate fully with the Distributor Consultant and shall provide the Distributor Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

c. Respondents shall require that, at the conclusion of the reviews by the Adviser Consultant and Distributor Consultant (collectively referred to as the Independent Compliance Consultants), which in no event shall be more than 120 days after the date of entry of the Order, each Independent Compliance Consultant shall submit a Report to the Respondent, the trustees of the Columbia Funds advised by Columbia Advisors (in the case of Columbia Advisors) and funds distributed by Columbia Distributor (in the case of Columbia Distributor), and the staff of the Commission. The Respondents shall require that the Adviser Consultant's Report address the issues described in paragraph 65(a) of this Order and the Distributor Consultant's Report shall address the issues described in paragraph 65(b) of this Order. Respondents shall require that each Report include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of Respondents and the pertinent Funds, and a procedure for implementing the recommended changes in or improvements to Respondents' policies and procedures.

d. Respondents shall adopt all recommendations with respect to Respondents contained in the Reports of the Independent Compliance Consultants; provided, however, that within 150 days after the date of entry of the Order, Respondents shall in writing advise the Independent Compliance Consultants, the trustees of the pertinent Columbia Funds and the staff of the Commission of any recommendations that a Respondent considers to be unnecessary or inappropriate. With respect to any recommendation that Respondents consider unnecessary or inappropriate, Respondents need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

e. As to any recommendation with respect to Respondents' policies and procedures on which Respondents and the Independent Compliance Consultants do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event Respondents and the Independent Compliance Consultants are unable to agree on an alternative proposal acceptable to the staff of the Commission, Respondents will abide by the determinations of the Independent Compliance Consultants.

f. Respondents: (a) shall not have the authority to terminate the Independent Compliance Consultants, without the prior written approval of a majority of the independent trustees of the Columbia Funds advised by Columbia Advisors (in the case of Columbia Advisors) and funds distributed by Columbia Distributor (in the case of Columbia Distributor) and the staff of the Commission; (b) shall compensate the Independent Compliance Consultants, and persons engaged to assist the Independent Compliance Consultants, for services rendered pursuant to the Order at their reasonable and customary rates; and (c) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultants and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultants from transmitting any information, reports, or documents to the trustees or the Commission.

g. Respondents shall require that the Independent Compliance Consultants, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with any Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such, provided, however, that notwithstanding the foregoing the Independent Compliance Consultants may serve as

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 47 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 25 of 30

Independent Compliance Consultants pursuant to the Bank of America Order. Respondents shall require that any firm with which an Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent trustees of the Columbia Funds advised by Columbia Advisors (in the case of Columbia Advisors) and funds distributed by Columbia Distributor (in the case of Columbia Distributor) and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with any Columbia-affiliated entity, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

66. Periodic Compliance Review. Commencing in 2006, and at least once every other year thereafter, Respondents shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of Respondents. At the conclusion of the review Respondents shall require the third party to issue a report of its findings and recommendations concerning Respondents' supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Respondents and their employees in connection with their duties and activities on behalf of and related to the Columbia Funds advised by Columbia Advisors (in the case of Columbia Advisors) and funds distributed by Columbia Distributor (in the case of Columbia Distributor). Each such report shall be promptly delivered by Respondents to the Internal Compliance Controls Committee of Columbia Advisors or Columbia Distributor; and to the Compliance or Audit Committee of the board of trustees of each Columbia Fund advised by Columbia Advisors (in the case of Columbia Advisors) and funds distributed by Columbia Distributor (in the case of Columbia Distributor).

67. Independent Distribution Consultant. Respondents shall retain, within 10 days of the date of entry of the Order, the services of an Independent Distribution Consultant not unacceptable to the staff of the Commission and the independent trustees of the Columbia Funds. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by Respondents. Respondents shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to their files, books, records, and personnel as reasonably requested for the review. Respondents shall require that the Independent Distribution Consultant develop a Distribution Plan for the distribution of the total disgorgement and penalty ordered in paragraph IV. below, and any interest or earnings thereon, according to a methodology developed in consultation

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 48 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 26 of 30

with Respondents and the Independent trustees of the Columbia Funds and acceptable to the staff of the Commission.

   a.  Respondents shall require that the Independent Distribution Consultant submit to Respondents and the staff of the Commission the Distribution Plan no more than 100 days after the date of entry of the Order.

   b.  The Distribution Plan developed by the Independent Distribution Consultant shall be binding unless, within 130 days after the date of entry of the Order, Respondents or the staff of the Commission advise, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

   c.  With respect to any determination or calculation of the Independent Distribution Consultant with which Respondents or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 160 days of the date of entry of the Order. In the event that Respondents and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations and calculations of the Independent Distribution Consultant shall be binding.

   d.  Within 175 days of the date of entry of this Order, Respondents shall require that the Independent Distribution Consultant submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 1101 [17 C.F.R. § 201.1101] of the Commission's Rules Regarding Disgorgement and Fair Fund Plans. Following a Commission order approving a final plan of disgorgement, as provided in Rule 1104 [17 C.F.R. § 201.1104] of the Commission's Rules Regarding Disgorgement and Fair Fund Plans, the Independent Distribution Consultant and Respondents shall take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

   e.  Respondents shall require that the Independent Distribution Consultant, for the period of the engagement and for a period of two years from completion of the engagement, not enter into any employment, consultant, attorney-client, auditing or other professional relationship with either Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such, provided, however, that notwithstanding the foregoing the Independent Distribution Consultant may serve as Independent Distribution Consultant pursuant to the Bank of America Order. Respondents shall require that any firm with which

Case 1:05-cv-10793-WGY     Document 14-2     Filed 06/14/2005     Page 49 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 27 of 30

- the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order not, without prior written consent of the Independent trustees and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with either Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

68. Excess Recovery. If Respondents, in their own right, recover in respect of the actions set forth in this order an amount, after fees and expenses, in excess of the aggregate amount paid by Respondents for the benefit of the Funds or their shareholders (exclusive of any portion of the civil penalty that is paid for the benefit of the Funds or their shareholders), then the excess amount shall be paid to the Commission for distribution as contemplated by paragraph 67 above.

69. Certification. No later than twenty-four months after the date of entry of the Order, the chief executive officer of each Respondent shall certify to the Commission in writing that Respondent has fully adopted and complied in all material respects with the requirements set forth in paragraphs 63 through 68 of this section and with the recommendations of the Independent Compliance Consultants or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

70. Recordkeeping. Respondents shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record except electronic mail as set forth below, of Respondents' compliance with the undertakings set forth in paragraphs 63 through 68 of this section. Respondents shall preserve for a period not less than three years from the end of the fiscal year last used, the first two years in an easily accessible place, any electronic mail record of Respondents' compliance with the undertakings set forth in paragraphs 63 through 68 of this section.

71. Deadlines. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A. Pursuant to Section 203(e) of the Advisers Act, Columbia

Case 1:05-cv-10793-WGY    Document 14-2    Filed 06/14/2005    Page 50 of 52

Columbia Management Advisors, Inc and Columbia Funds Distributor, Inc.,: Admin. P...    Page 28 of 30

Advisors is hereby censured.

B. Pursuant to Section 15(b)(4) of the Exchange Act, Columbia Distributor is hereby censured.

C. Pursuant to Section 203(k) of the Advisers Act and Section 9 (f) of the Investment Company Act, Respondent Columbia Advisors shall cease and desist from committing or causing any violations and any future violations of Sections 204A, 206(1) and 206(2) of the Advisers Act and Sections 17(d) and 34(b) of the Investment Company Act and Rule 17d-1 thereunder.

D. Pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Section 203(k) of the Advisers Act and Section 9(f) of the Investment Company Act, Respondent Columbia Distributor shall cease and desist from committing or causing any violations and any future violations of Section 17 (a) of the Securities Act, Sections 10(b) and 15(c) of the Exchange Act and Rule 10b-5 thereunder, Sections 206(1) and 206(2) of the Advisers Act and Sections 17(d) and 34(b) of the Investment Company Act and Rule 17d-1 thereunder.

E. Respondents shall pay, within 20 days of the entry of the Order, on a joint and several basis, $70,000,000 in disgorgement plus a civil money penalty of $70,000,000, for a total payment of $140,000,000.

  1. Such payment shall be: (a) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (b) made payable to the Securities and Exchange Commission; (c) wired, hand-delivered, or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22132; and (d) submitted under cover letter that identifies Columbia Advisors and Columbia Distributor as Respondents in these proceedings, a copy of which cover letter, wire transfer instruction, money order, or check shall be sent to David P. Bergers, Associate District Administrator, Securities and Exchange Commission, Boston District Office, 73 Tremont Street, Boston, MA 02108.

  2. There shall be, pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund established for the funds described in Section IV.E. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that they shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil

penalty paid by Respondents ("Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Respondents agree that they shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Respondents in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against a Respondent by or on behalf of one or more investors based on substantially the same facts as set forth in the Order in this proceeding.

F. Respondents shall comply with the undertakings set forth in paragraphs 63 through 70 above.

G. Other Obligations and Requirements. Nothing in this Order shall relieve Respondents or any Columbia Fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

By the Commission.

Jonathan G. Katz
Secretary

## Endnotes

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other persons or entities in this or any other proceeding.

[2] The undertakings set forth herein shall be binding upon all successors to Respondents. To the extent that any such successor entity shall be subject to the Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order in the matter of Banc of America Capital Management, LLC, BACAP Distributors, LLC, and Banc of America Securities, LLC ("the Bank of America Order"), which is being entered simultaneously with this Order, if any undertakings contained in the Bank of America Order are inconsistent with this Order, the undertakings of the Bank of America Order shall govern the successor entity's conduct. As used herein, "Columbia Fund" means all registered investment companies currently or hereafter managed by a subsidiary of Columbia Management Group, and shall include all predecessor and successor entities at such time as they are or were managed by a subsidiary of Columbia Management Group. Columbia Management Group includes any successor to that

entity with the same direct or indirect ownership as Columbia
Management Group's current ownership.

*http://www.sec.gov/litigation/admin/33-8534.htm*