UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
DEAN DELAVENTURA, on behalf of    )
Himself and all others            )
similarly situated,               )
                                  )
     Plaintiffs,                  )
                                  )     CIVIL ACTION
     v.                           )     NO. 05-10793-WGY
                                  )
COLUMBIA ACORN TRUST;             )
COLUMBIA FUNDS TRUSTS I-IX,       )
                                  )
     Defendants.                  )
                                  )
```

MEMORANDUM

YOUNG, D.J.                                    February 1, 2006

It is the province of the Congress so to allocate

jurisdiction and venue among the 94 United States District Courts

as to "secure the Blessings of Liberty to ourselves and our

Posterity," U.S. Const. pmbl., and achieve the "just, speedy, and

inexpensive determination of every action,"[1]  Fed. R. Civ. P. 1.

_____

[1] The extent of the congressional power in this regard has
been an issue throughout the history of the Republic.  See
generally Michael G. Collins, The Federal Courts, the First
Congress, and the Non-Settlement of 1789, 91 Va. L. Rev. 1515
(2005).  Occasionally, Congress uses its powers to "regulate" the
courts' jurisdiction simply to strip disfavored classes of access
to a judicial branch Congress mistrusts.  See, e.g., Gonzales v.
United States, 135 F. Supp. 2d 112, 115 n.5 (D. Mass. 2001)
(discussing the Antiterrorism and Effective Death Penalty Act of
1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified in scattered

1

It is the province of the competent attorney to shop for a forum believed best suited to the client's cause. It is the province of the federal judiciary fairly to mediate between the aspiration and the reality.

Since all 94 district courts follow identical rules concerning discovery and trial preparation, one excellent innovation in civil practice is the idea that a single judge might manage a number of "related" cases, getting them all ready for trial in a uniform manner and returning the "trial-ready" cases from whence they came (i.e., to the district courts with proper jurisdiction and venue) for trials before local juries.

## I.    Multi-District Litigation.

This excellent innovation has been codified by statute -- 28 U.S.C. § 1407(a) -- which provides:

> When civil actions involving one or more common
> questions of fact are pending in different districts,

---

sections of 8, 18, 22, 40, and 42 U.S.C)); Enwonwu v. Chertoff, 376 F. Supp. 2d 42, 78-85 (D. Mass. 2005) (discussing the provisions of the REAL ID Act of 2005, Pub. L. No. 109-113, Div. B., 119 Stat. 231, § 106, that strip the district courts of habeas jurisdiction over certain aliens facing deportation). It is reported that, having successfully eliminated the district courts, the executive will move on to eliminate the circuit courts as well. To the extent that jurisdiction continues to inhere in the courts of appeal, the executive is already arguing that it -- not the judiciary -- must do the constitutional fact finding. See Oral Arguments, Enwonwu v. Gonzales, No. 05-2053 (1st Cir. Jan. 11, 2006). At some point, of course, such restrictions on habeas jurisdiction implicate the Suspension Clause of the Constitution. U.S. Const. art I, § 9, cl. 2.

2

> such actions may be transferred to any district for
> coordinated or consolidated pretrial proceedings. Such
> transfers shall be made by the judicial panel on
> multidistrict litigation authorized by this section
> upon its determination that transfers for such
> proceedings will be for the convenience of the parties
> and witnesses and will promote the just and efficient
> conduct of such actions. Each action so transferred
> shall be remanded by the panel at or before the
> conclusion of such pretrial proceedings to the district
> from which it was transferred unless it shall have been
> previously terminated . . . .

So, multi-district litigation ("MDL") practice was born.

In order for a case to be transferred, the civil actions pending in different judicial districts must have one or more questions of fact in common. 28 U.S.C. § 1407(a). Additionally, the transfer must be convenient for the parties and the witnesses and must promote justice and efficiency. Id.

As in the present case, MDL is "used to manage mass torts." James M. Wood, The Judicial Coordination of Drug and Device Litigation, 54 Food & Drug L.J. 325, 337 (1999); see Desmond T. Barry, Jr., A Practical Guide to the Ins and Outs of Multidistrict Litigation, 64 Def. Couns. J. 58, 66 (1997) (stating that "the procedures are intended only as a guide to promote the fair and efficient resolution of complex litigation"); id. at 59 (noting the purpose of MDL is to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort on the part of the parties, the attorneys, the witnesses and the courts").

3

The Judicial Panel on Multi-District Litigation has the
authority to "centraliz[e] . . . cases in a single district
called the transferee district for pretrial management . . . ."
Gregory Hansel, Extreme Litigation: An Interview With Judge Wm.
Terrell Hodges, 19 Me. B.J. 16, 18 (2004) (emphasizing that
transfers are for pretrial management only).[2]  The judicial panel
is "neither a trial court, appellate tribunal, nor (as some have
called it) a mysterious 'Super Court.'  Rather, it is simply a
special judicial creature comprised of seven federal district or
appellate court judges . . . ."  Earle F. Kyle, IV, The Mechanics
of Motion Practice Before the Judicial Panel on Multidistrict
Litigation, 175 F.R.D. 589, 589 (1998).

The panel considers a large number of cases, including
patent and antitrust cases, and claims against pharmaceutical
manufacturers.  Id. at 589 n.14.  Indeed, some commentators
anticipate that the Class Action Fairness Act of 1995, Pub. L.
No. 109-2, 119 Stat. 4 (2005), may "generate more federal class
actions of national scope[,] resulting in more multi-district
litigation . . . ."  Gary L. Sasso & Carlton Fields, Defense of
Federal Regulation Class Actions, 728 PLI/Lit. 95, 162 (2005).
But see infra note 9 and accompanying text.

----

[2] MDL is said only to "concentrate," In re "Agent Orange"
Prod. Liab. Litig., 506 F. Supp. 762, 790 (E.D.N.Y. 1980), or
"centraliz[e]," Hansel, 19 Me. B.J. at 18, cases for pretrial
proceedings rather than permanently consolidate them.

4

The MDL process relies on the "informed discretion of the
judiciary." H.R. Rep. No. 90-1130 (1968), reprinted in 1968
U.S.C.C.A.N. 1898, 1901; Barry, 64 Def. Couns. J. at 58 (noting
that MDL requires "strong and creative action from transferee
judges").

> Over the past decades, judges have gained increasing
> authority over the pretrial process and the
> configuration of lawsuits themselves. One source of
> that control . . . is the ability of judges to insist
> that litigants combine their actions, by consolidation
> and multi-district litigation, so that the judiciary
> can consider related problems together. This
> increased judicial authority has come at the expense of
> the autonomy of at least lawyers, if not also their
> clients.

Judith Resnik, Whose Judgment? Vacating Judgments, Preferences
for Settlement, and The Role of Adjudication at the Close of the
Twentieth Century, 41 U.C.L.A. L. Rev. 1471, 1485-86 (1994)
(emphasis added, footnotes omitted); see also In re Showa Denko
K.K. L-Tryptophan Prods. Liab. Litig.-II (Rapoport v. Showda
Denko K.K.), 953 F.2d 162, 165-66 (4th Cir. 1992) (resolving a
"serious question" by ruling that MDL transfers in no way expand
a court's jurisdiction so as to allow them to reach those not a
party to a case).[3]

---

[3] Though MDL practice does serve a purpose, it is certainly
not without problems. Kyle, 175 F.R.D. at 589 (noting that
"while Panel action may serve a 'greater litigation good' and
meet strong national needs of system-wide judicial economy, those
'macro-litigation benefits' are not always universally
celebrated"). The criticisms of MDL are many:

- "[T]here is no authority for trial of the mass tort

5

The Judicial Panel on Multidistrict Litigation
acted upon 22,516 civil actions pursuant to 28 U.S.C.
1407 during the 12-month period ending September 30,
2004.  The Panel transferred 10,681 cases originally
filed in 91 district courts to 46 transferee districts
for inclusion in coordinated or consolidated pretrial
proceedings for 11,835 actions previously initiated in
the transferee districts.  . . .  The Panel did not
order transfer in 29 newly docketed litigations
involving 268 actions.
     Since the Panel's creation in 1968, it has
centralized 211,317 civil actions for pretrial
proceedings. As of September 30, 2004, a total of
10,899 actions had been remanded for trial, 389 actions
had been reassigned within the transferee districts,
and 136,070 actions had been terminated in the
transferee courts.  At the end of this fiscal year,
63,959 actions were pending throughout 54 transferee
district courts.

Leonidas Ralph Mecham, Judicial Business of the United States

Courts, 2004 Annual Report of the Director 25, available at

http://www.uscourts.gov/judbususc/judbus.html (last visited Jan.

---

case;"
- "[I]t does not resolve state court cases;"
- "[I]t hampers settlement because of the numbers of
  parties and difficulty in maintaining confidentiality;"
- "[B]ecause of the individual character of claims
  involving mixed issues of law, pretrial MDL coordination
  cannot accommodate a global resolution of cases."

Wood, 54 Food & Drug Law J. at 337 (footnotes omitted).  It is
also observed that "in the rush to file cases, baseless claims
may be filed."  Lawrence T. Hoyle, Jr. & Edward W. Madeira, Jr.,
"The Philadelphia Story": Mass Torts in the City of Brotherly
Love, 2 Sedona Conf. J. 119, 145 (2001).  Additionally, MDL often
gives rise to choice of law issues.  Elizabeth J. Cabraser,
Certification of Non-Federal Question Claims in Federal Courts:
Strategies for Plaintiffs, 679 PLI/Lit. 29, 73 (2002).  Further
still, MDL fails to "address the problem of competing class
actions in different states, or in both federal and state
courts."  Hon. Lee H. Rosenthal, Proposals for Further Study: The
Reporter's Call for Comment, Ass'n of Trial Law. of Am., Winter
Convention Ref. Materials at 333 (2002).

29, 2006). Certain conclusions follow obviously from these statistics:

First, the MDL panel itself overwhelmingly favors the procedure it administers. Thus, once the MDL panel decides to consider a matter pursuant to Section 1407(a), transfer is more than likely.

Second, as compared to the processing time of an average case, MDL practice is slow, very slow. See Christopher J. Roche, A Litigation Association Model to Aggregate Mass Tort Claims for Adjudication, 91 Va. L. Rev. 1463, 1469 (2005) ("[D]elay is a common feature of mass tort litigation. Resolution of cases may take years, in some cases effectively precluding plaintiffs from any meaningful recovery."). Despite the assumption that "transfer and consolidation will promote judicial efficiency which will result in convenience to the parties and witnesses", Stanley J. Levy, Complex Multidistrict Litigation and the Federal Courts, 40 Fordham L. Rev. 41, 47 (1971), the purported "efficiency gains of consolidated trial are not supported by reality", Benjamin W. Larson, Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach: Respecting the Plaintiff's Choice of Forum, 74 Notre Dame L. Rev. 1337, 1364 (1999).

Third, as MDL practice flourishes, many cases are transferred out of their home courts and away from local juries, but few -- very few -- ever return for trial. The reasons are

7

twofold. Most cases settle, and this is as it should be. MDL

cases settle at approximately the same rate as cases handled in

their home courts. Yet the "settlement culture"[4] for which the

_____

[4] The shift from trials as the central icon of the federal
courts to a "settlement culture" may be said to trace back to the
tenure of Chief Justice Warren E. Burger. See Chief Justice
Highlights Needs and Achievements in Year-End Report, Third
Branch, Feb. 1984, at 1, 10 (calling for increased use of
arbitration); see also Martin J. Newhouse, Some Reflections on
ADR and the Changing Role of the Courts, Boston Bar J., Mar./Apr.
1995, at 15, 17 ("[F]ormer Chief Justice Burger has consistently
been a vocal advocate of ADR . . . ."). It reached its apogee
during the period 1990-1995, when the Hon. William W. Schwarzer
was Director of the Federal Judicial Center. A distinguished
judge and author, see e.g., William Schwarzer, Managing Civil
Litigation: The Trial Judge's Role, 61 Judicature 400 (1978),
Judge Schwarzer is an outspoken advocate of managing toward
settlement.

    For criticism of this view, see Judith Resnik, Managerial
Judges, 96 Harv. L. Rev. 374, 424 (1982). See also David S.
Clark, Adjudication to Administration: A Statistical Analysis of
Federal District Courts in the Twentieth Century, 55 S. Cal. L.
Rev. 65 (1981); Owen M. Fiss, Against Settlement, 93 Yale L.J.
1073 (1984); Owen M. Fiss, The Bureaucratization of the
Judiciary, 92 Yale L.J. 1442 (1983); Owen M. Fiss, Out of Eden,
94 Yale L.J. 1669, 1673 (1985); Kenneth P. Holland, The Twilight
of Adversariness: Trends in Civil Justice, in Philip Dubois, ed.,
The Analysis of Judicial Reform 17 (1982); Dale Arthur Oesterle,
Dangers of Judge-Imposed Settlements, 9 Litig. 29 (Spring 1982);
Dale Arthur Oesterle, Trial Judges in Settlement Discussion:
Mediators or Hagglers?, 9 Cornell L. Forum 7 (1982); Stephan
Landsman, The Decline of the Adversary System: How the Rhetoric
of Swift and Certain Justice Has Affected Adjudication in
American Courts, 29 Buffalo L. Rev. 487 (1980); Carrie Menkel-
Meadow, For and Against Settlement: For What Purpose the
Mandatory Settlement Conference?, paper presented at the Annual
Chief Justice Earl Warren Conference on Advocacy in the United
States, Charlottesville, Va. (June 26-30, 1985) at 14; Arthur R.
Miller, The Adversary System: Dinosaur or Phoenix?, 69 Minn. L.
Rev. 1, 30-35 (1984). But see D. Marie Provine, Report,
Settlement Strategies for Federal District Judges, Federal
Judicial Center (1986) (criticizing academics and praising
"settlement-oriented judges" who have a "fundamental commitment
to enhancing settlement opportunities in federal courts").

8

Today, there is something of a judicial backlash against
making settlement the central goal of our federal court
processes.  The District of Massachusetts is called a "pocket[]
of resistance" to the settlement culture.  Marc Galanter, The
Hundred-Year Decline of Trials and the Thirty Years War, 57 Stan.
L. Rev. 1255, 1273 & n.63 (2005).  I trace this reawakening of
interest in our traditional trial processes to a moving speech
given on April 26, 2003 to the annual meeting of chief district
court judges by Hon. Joseph F. Anderson, Jr., Chief Judge of the
District of South Carolina.  Chief Judge Anderson there issued a
powerful call to devote ourselves to the core function of the
judicial office -- the fair and impartial trial of cases.  See
also Hon. Joseph F. Anderson, Jr., Jury Service as the 'Palladium
of Liberty', The State (Columbia, S.C.), Aug. 8, 2004.  Alex
Sanders, one of America's foremost jurists, minces no words:

     Trial judges should return to being trial judges,
     instead of docket managers.  They should start treating
     jury trials as a vindication of the justice system
     rather than a failure of the justice system.  They
     should revere and respect the jury trial as the
     centerpiece of American democracy.

Alex Sanders, former Chief Justice, South Carolina Court of
Appeals and former President of the College of Charleston, Ethics
Beyond the Code: The Vanishing Jury Trial, Address to the Am.
Trial Law. Ass'n (Dec. 2, 2005); see also Ad Hoc Comm. on the
Future of the Civil Trial of the Am. Coll. of Trial Law., The
"Vanishing Trial:" The College, The Profession, The Civil Justice
System, 226 F.R.D. 414 (2005) ("The number of civil trials in
federal court over the 40 years from 1962-2002 has fallen, both
as a percentage of filings and in absolute numbers. . . .  These
numbers are particularly startling in light of the enormous
increase in litigation over the same 40 year period."); Hon.
Patrick E. Higginbotham, So Why Do We Call Them Trial Courts? 55
SMU L. Rev. 1405 (2002) (expressing his "concern over trial
numbers" and noting "the decline in trials" and "the attending
decline in participation of lay citizens . . . in our justice
system"); John W. Keker, The Advent of the "Vanishing Trial": Why
Trials Matter, The Champion (Sept./Oct. 2005) 32, 33 ("Judges led
the charge to fewer trials and now they regret it."); Nathan
Koppel, Trial-less Lawyers: As More Cases Settle, Firms Seek Pro
Bono Work to Hone Associates' Courtroom Skills, Wall St. J., Dec.
1, 2005, at B1, (quoting Judge David Hittner -- "we are losing
sight of the basic right to trial by jury", -- and Professor Marc
Galanter -- as "more and more judges begin to say, 'We are really

9

federal courts are so frequently criticized is nowhere more

prevalent than in MDL practice.   The Manual for Complex

Litigation seems virtually to command this result:

> One of the values of multidistrict proceedings is that
> they bring before a single judge all of the federal
> cases, parties, and counsel comprising the litigation.
> They therefore afford a unique opportunity for the
> negotiation of a global settlement.  Few cases are
> remanded for trial; most multidistrict litigation is
> settled in the transferee court.  As a transferee
> judge, it is advisable to make the most of this
> opportunity and facilitate the settlement of the
> federal and any related state cases.

Federal Judicial Center, Manual for Complex Litigation (Fourth) §

20.132 (emphasis added).

Thus, it is almost a point of honor among transferee judges

acting pursuant to Section 1407(a) that cases so transferred

shall be settled rather than sent back to their home courts for

trial.  This, in turn, reinforces the unfortunate tendency to

hang on to transferred cases to enhance the likelihood of

settlement.  Indeed, MDL practice actively encourages retention

even of trial-ready cases in order to "encourage" settlement.

_____

losing the trial as a societal institution,' many of them become
less prone to push for settlements"); Leonard Post, 79% Decline:
Federal Tort Trials Continue a Downward Spiral: Increased Use of
ADR, Better Case Management Cited, Nat'l L.J., Aug. 22, 2005, at
7 (quoting Professor Stephen Burbank as saying "federal judges
now give more attention to case management and nontrial
adjudication than they give to trials" and that "it is quite
clear that 'trial' judges ought to spend more time on that
activity from which [their] name is taken"); Hon. William G.
Young, An Open Letter to U.S. District Judges, Fed. Lawyer, July
2003, at 30.

10

See, e.g., MDL No. 875 (subjecting thousands of asbestosis cases
to MDL practice for over fourteen years). "The Panel is
reluctant to order remand absent a suggestion of remand from the
transferee district court." R. Proc. Jud. Panel Multidistrict
Litig. 7.6(d). There are no public figures evidencing how often,
if ever, the Panel has remanded a case over the objection of the
transferee judge.

Although the Supreme Court has made clear that it was never
the statutory intent that Section 1407(a) be interpreted as a
super-venue statute allowing transfer for all purposes to the
transferee judge, Lexecon Inc. v. Milberg Weiss Bershad Hynes &
Leroch, 523 U.S. 26 (1998), the Federal Judicial Center has long
considered it "[a] major deficiency in MDL procedure . . . that
the panel does not have statutory authority to transfer cases for
trial." Thomas E. Willging, Report, Trends in Asbestos
Litigation, Federal Judicial Center (1987). The Judicial
Conference has lobbied[5] for legislation "which would effectively
over-rule Lexecon by statutory amendment." Hon. Wm. Terrell
Hodges, Chair of Judicial Panel Sees Role as Gatekeeper, The

_____

[5] While it is, of course, appropriate and necessary for the
judiciary to speak out on matters of judicial administration, see
Canon 4, Code of Conduct for United States Judges (2000), at
least one commentator has been highly critical of such efforts to
the extent they may affect substantive rights, see Judith Resnik,
The Programmatic Judiciary: Lobbying, Judging, and Invalidating
the Violence Against Women Act, 79 S. Cal. L. Rev. 269, 269-276
(2000).

11

Third Branch, Nov. 2005, at 10 ("Hodges Interview").  Indeed, the
chair of the MDL Panel could not be more straightforward:

> We're hopeful that in this Congress the legislation
> will pass and that Lexecon will be a thing of the past.
> It's hard to know how many multidistrict dockets
> actually have been affected in some substantial way by
> the requirement of Lexecon that constituent actions be
> remanded to the transferor courts as soon as the case
> is ready for trial.  A number of devices, frankly, have
> been utilized by innovative judges since Lexecon to
> minimize its effect.

Id. at 12.

Put aside the rather novel scene of the chair of an inferior
tribunal denigrating a decision of the Supreme Court of the
United States.  The more important point is that the pursuit of
settlement without offering a trial is both unwise -- and a
defense ploy.

Some, believing that any settlement is preferable to any
trial, may consider this a desirable outcome.[6]  In actuality,

---

6

    I was a law clerk for a trial judge who hated
trials.  I describe her as a trial judge for the irony,
and because conducting trials was part of her job
description.  In reality, however, a "coerced
settlement" or "enter-my-courtroom-and-I'll-make-you-
pay" or "anti-trial" judge would be a more accurate
moniker.  This jurist was happiest in her business
suit, at her desk in chambers, in conference with trial
attorneys, cajoling and imploring and yelling.  She was
never thrilled to find herself draped in a robe, in a
courtroom, sitting on high.
    The judge's distaste for trials was a bit about
efficiency, but not much.  . . .  The judge's problem
with trials was more spiritual: she didn't believe in
them.  Trials created "win/lose" scenarios, whereas the
judge thought that "win/win" or "not win so much/not

12

however, this marginalization of juror fact finding[7] perversely

_____

lose so much" were possible and better alternatives.
With trials, outcomes are contingent on unpredictable
jurors and wooden rules of evidence. And yes, trials
cost money and, especially, time. In the judge's view,
their costs far outweighed their benefits.

Paul Butler, The Case for Trials: Considering the Intangibles, 1
J. Empirical Legal Stud. 627, 627-28 (2004). "[One] federal
district judge stated that he regarded the eight percent trial
rate as evidence of 'lawyers' failure.'" Judith Resnik, Trial as
Error, Jurisdiction as Injury: Transforming the Meaning of
Article III, 113 Harv. L. Rev. 924, 925 (2000) (discussing trial
judges who espouse the viewpoint that settlements are preferable
to trials). "Trials, to an increasing extent, have become
luxury. . . . When cases are handled in a package or group
instead of one at a time, it is hard, if not impossible, for the
lawyers or the judge to maintain time-honored concepts of due
process and the adversary system. Hon. Edwin Ludwig, The
Changing Role of the Trial Judge, 85 Judicature 216, 217, 253
(2002).

    [7] Abandonment of a fact-finding process signals a breakdown
in America's adversary system. This is not always to be avoided.
The adversary process has its limits. As a society, we have
already abandoned the adversary system in labor disputes and
issues involving the dissolution of marriage, preferring instead
almost any solutions that will accommodate a continuing modus
vivendi.
    As the text demonstrates, in MDL practice fact finding
generally appears far less important than forging some global
settlement. Nor is this the only area once reserved for jury
determination where today federal judges advance what they
perceive to be more compelling goals than allowing our citizens
independently to ascertain the facts. Such misguided efforts
generally meet with disappointing results.
    In the area of patent law, for example, jury fact finding
has been supplanted in favor of judicial law declaring on the
issues of how the skilled artisan would read the words of a
patent claim, Markman v. Westview Instruments, Inc., 517 U.S. 370
(1996); but see Arthur R. Miller, The Pretrial Rush to Judgment:
Are the "Litigation Explosion," "Liability Crisis," and
Efficiency Clichés Eroding Our Day in Court and Jury Trial
Commitments?, 78 N.Y.U. L. Rev. 982, 1086-88 (2003), and whether
a patent applicant who amends a claim intends to abandon matters
earlier claimed, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushibi

Co., 344 F.3d 1359 (Fed. Cir. 2003) (en banc); but see Amgen,
Inc. v. Hoechst Marion Roussel, Inc., 287 F. Supp. 2d 126, 134-36
(D. Mass. 2001).  Law declaring as to matters that are
situational and case-specific is a recipe for disaster, however,
as law declaring is a matter for precise analysis unaided by
considerations of the burden of proof.  A judge is duty-bound to
adhere to her independent view of the law.  She may be persuaded,
but she owes deference only to a higher court and may never
compromise.  It is perhaps no accident, therefore, that having
virtually abandoned any deference to the jury's fact-finding
role, patent litigation is the slowest and most expensive
litigation in the United States, with a district court reversal
rate that once reached 42%.  This argument is more fully
developed in William G. Young, Ruminations on the Vanishing
Trial: The Role of the Federal Circuit and the Fact Law
Distinction, N.Y. Intellectual Prop. L. Ass'n (Jan. 13, 2006).

     The most striking abandonment of jury fact finding is found
in the area where one would last expect it -- our criminal laws.

     [Federal] criminal trials [are] rare events.  Trials
     are the system's Potemkin village, a piece of pretty
     scenery for display on Court TV while real cases, and
     lives, are disposed of more casually off-camera.
          That effect leads to another: a sharp decline in
     transparency.  In a healthy system, the law is what it
     appears to be.  The rules applied in court are the same
     as the rules on the street, and courts apply those
     rules often enough that citizens can tell what they
     are.  In our system, substantive law is a tool for
     evading inconvenient procedures, and courtrooms are
     used for guilty pleas. [Federal c]riminal punishment is
     allocated behind closed doors, where the lawyers dicker
     over charges and sentences.  Criminal codes do not
     describe the behavior that will actually land one in a
     prison cell, and sentencing rules do not accurately
     predict how long one will stay there.  Instead, the law
     of crimes and sentences serves as a menu of threats for
     police and bargaining options for prosecutors.  The
     real law -- the law that governs individual cases --
     arises from discretionary decisions to order off the
     menu: police officers' arrests and lawyers' plea
     bargains.  That law is invisible to outsiders.

William J. Stuntz, The Political Constitution of Criminal
Justice, 119 Harv. L. Rev. 780, 817-18 (2006) (footnotes
omitted).

                              14

Reflecting the triumph of plea bargaining over trial, George
Fisher, Plea Bargaining's Triumph, 109 Yale L.J. 857 (2000),
federal courts today routinely make the most crucial decisions
about a citizen's liberty on a "mishmash of data including
blatantly self-serving hearsay largely served up by the
[government]." United States v. Green, 346 F. Supp. 2d 259, 280
(D. Mass. 2004), vacated in part by United States v. Yeje-
Cabrera, 430 F.3d 1 (1st Cir. 2005), and vacated and remanded by
United States v. Pacheco, No. 04-1882, -- F. 3d -- (1st Cir. Jan.
19, 2006).  Indeed, the parties may freely bargain for an
alternate reality that renders the rhetoric about "real offense
sentencing", U.S. Sentencing Commission, Federal Sentencing
Guidelines Manual 4-5 (2005), mere sophistry and bears so little
relation to the facts as to mock our trial processes.  Make no
mistake.  Whatever the Attorney General may say, see Amie N. Ely,
Note, Prosecutorial Discretion as an Ethical Necessity: The
Ashcroft Memorandum's Curtailment of the Prosecutor's Duty to
"Seek Justice", 90 Cornell L. Rev. 237, 252-59 (2005), the
bargaining over facts continues apace, even in the wake of Booker
v. United States, 543 U.S. 220 (2005).  See, e.g., United States
v. Bleidt, No. 05-CR-10144-WGY, Plea Hearing (Dec. 5, 2005) (aged
and vulnerable nature of many victims omitted to secure plea);
United States v. Fuller, No. 05-CR-10082-WGY-2, Plea and
Sentencing Hearing (Nov. 16, 2005) (fraud loss amount understated
to secure plea); United States v. Montilla, No. 04-CR-10160-WGY-
3, Sentencing Hearing (Oct. 18, 2005) (drug quantity understated
to secure plea); United States v. Siciliana, No. 04-CR-10372-WGY-
1, Plea Hearing (Sept. 6, 2005) (same); United States v. Arco,
No. 04-CR-10372-WGY-2, Plea Hearing (Sept. 6, 2005) (same).
Moreover, the First Circuit embraces a regime in which such
omissions are never brought to the attention of the judge.
United States v. Yeje-Cabrera, 430 F.3d 1, 27-30 (1st Cir. 2005)
("[T]he costs of monitoring compliance with . . . a mandatory
[factual] disclosure system are high, and many of the
efficiencies created by plea bargaining would be lost.  . . .
[Fact bargaining, therefore,] transgresse[s] no norm,
constitutional or legal.").  Judicial efforts to enhance the
fact-finding process are met with resistance from a government
that considers such efforts to be an "unfair obligation on [it]".
United States v. Duverge, No. 05-CR-10265-WGY-1, Mot. to Recons.
Re Proof of Enhancements [Doc. No. 37] (concerning trial and
sentencing procedures).  Of course, "[i]f fact bargaining is
acceptable, then the entire moral and intellectual basis of the
Sentencing Guidelines is rendered essentially meaningless.  If
'facts' don't really matter, neither does 'judging' contribute
anything . . . ." Berthoff v. United States, 140 F. Supp. 2d 50,

15

and sharply skews the MDL bargaining process in favor of

defendants.  Consider: All litigants bargain in the shadow of

trial.  Those averse to the inevitable uncertainties of the

direct democracy of the American jury will factor the risks of

trial into their settlement postures.  Failure to arrive at a

---

67 (D. Mass. 2001), aff'd No. 94-1714 (1st Cir. Nov. 29, 1995).
    Fact finding is slow, labor intensive, and precise.  It is
also just -- as just as any human endeavor in human history.  The
passing of the judicial interest in fact finding is the major
reason that average on-bench time among active district judges
has declined from 790 hours in 1980 to 490 hours in 2002.
Federal Judicial Center, Chart, "Average Trial and Nontrial Time
Reported on the JS-10 by Judges Who We Active District Judges All
Year and Reported Time for at Least 11 Months" (on file with the
Court).

    The eclipse of fact finding foreshadows the twilight of
judicial independence.  In patent law, fact finding is eschewed
because the "fair preponderance" and "clear and convincing"
standards are considered imprecise compared to case-specific
judicial "law" declaring.  As a result, United States patent
litigation is the slowest and most expensive litigation in the
world and its trial outcomes more uncertain than any other type
of case.  We denigrate fact finding in our criminal justice
system in favor of plea bargaining and add "additional sentencing
penalties for trial", Alexandra Natapoff, Speechless: The
Silencing of Criminal Defendants, 80 N.Y.U. L. Rev. 1449, 1459
(2005), with the result that "[t]he federal system . . .
punish[es] trials so severely that the results do not deserve
public confidence", Ronald F. Wright, Trial Distortion and the
End of Innocence in Federal Criminal Justice, 154 U. Penn. L.
Rev. 79, 155 (2005).  And we denigrate fact finding in MDL
practice in favor of global settlements with the result that the
adversary process is skewed in favor of the rich and the
powerful.

    Yet "[f]acts are stubborn things," Rex v. Wemms (John
Adams's summation on behalf of the British soldiers accused of
the "Boston Massacre"), in Hiller B. Zobel, The Boston Massacre
293 (1970), and a judicial system cannot long continue to command
the respect and moral authority of the people it serves unless
the judicial edicts are actually based on facts -- facts found by
American juries wherever the Constitution so commands.

16

mutually acceptable settlement should, and in most cases does, result in a trial. In MDL practice, however, it is solely the transferee judge who controls the risk of trial. The litigant who refuses to settle can never get back to his home court to go before a local jury unless the transferee judge agrees.

Once trial is no longer a realistic alternative, bargaining shifts in ways that inevitably favor the defense. After all, a major goal of nearly every defendant is to avoid a public jury trial of the plaintiff's claims. Fact finding is relegated to a subsidiary role,[8] and bargaining focuses instead on ability to pay, the economic consequences of the litigation, and the terms of the minimum payout necessary to extinguish the plaintiff's claims. Commentators generally agree that MDL practice favors the defense.

MDL proceedings are described as a "delaying tactic used by defendants" which "consume a great deal of time." Benjamin W. Larson, Comment, Lexecon, Inc. v. Milberg Weiss Beshad Hynes

---

[8] It can be argued that the appalling attorney misconduct castigated by Judge Janis Graham Jack in In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563 (S.D. Tex. 2005), is, in part, a consequence of counsel's belief that their transparently fraudulent proffered silicosis diagnoses would never be tested by cross-examination in the crucible of trial, but were, instead, nothing more than a bargaining chip in settlement negotiations. See Thomas A. Donovan, Can the Courts Prevent Being Used as an Instrument to Perpetuate Fraud?, Fed. Law., Nov./Dec. 2005, at 5, 7 (suggesting that the sprawling and unresolved asbestosis MDL suffers from the same infirmities); Peter Geier, 'Sea Change' in Asbestos Torts is Here, Nat'l L.J., Oct. 31, 2005, at 1 (same).

and Lerash: Respecting the Plaintiff's Choice of Forum, 74 Notre

Dame L. Rev. 1337, 1364 (1999) (citing Mark Hermann, To MDL or

Not to MDL? A Defense Perspective, Litig., Summer 1998, at 43,

46; Stanley J. Levy, Complex Multidistrict Litigation and the

Federal Courts, 40 Fordham L. Rev. 41, 50 (1971)).  Plaintiffs

lose control over the management of their case.  Wood, 54 Food &

Drug L.J. at 337.

> [A] plaintiff's motive in pleading to secure a
> particular jurisdiction may not be evaluated in the
> removal versus remand struggle.  In response to this
> forum shopping, defense counsel have often filed a
> notice of removal alleging fraudulent joinder of the
> nondiverse defendant.  Before a plaintiff has the
> opportunity to file a motion to remand, defense counsel
> often initiates a reference to the Judicial Panel
> averring that the case is pending in a United States
> district court.  If, as a result of this reference, the
> Judicial Panel enters a transfer order, or a
> conditional transfer order, the plaintiff's counsel may
> face a David and Goliath situation.  Upon receipt of a
> conditional transfer order or a tag-along transfer
> order, many plaintiffs' counsel certainly understand
> David's fears in the face of Goliath.

Mike Roberts, Multidistrict Litigation and the Judicial Panel,

Transfer and Tag-Along Orders Prior to a Determination of Remand:

Procedural and Substantive Problem or Effective Judicial Public

Policy?, 23 Memphis St. U. L. Rev. 841, 842-43 (1993) (emphasis

added, footnotes omitted).  This "strategy allows the defense

counsel to attempt to secure a transfer order or conditional

transfer order before the original federal district court

determines, and in some cases even hears, the anticipated motion

18

to remand." Id. at 843.

This case illustrates this problem. The defendants here removed the action to federal court. Though this Court was able to rule on the motion to remand, it did not have sufficient time to issue a memorandum explaining its order prior to the conditional transfer order. Judge Hodges is, of course, correct when he says, "Well, of course some parties want centralization; some don't", Hodges Interview at 10, but a more accurate statement would be "Defendants generally want centralization; plaintiffs generally don't."

It is precisely because MDL practice is perceived so clearly to favor the defense that Congress appears to have lost confidence in a judicial management mechanism that once had such great promise. The Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005), itself thought to be legislation that favors business defendants, see Natale v. Pfizer, Inc., 379 F. Supp. 2d 161, 164-68 (D. Mass. 2005), contains an unmistakable rebuke to the Panel on Multi-District Litigation in Section 4, which provides that no class action removed to federal court under its provisions shall thereafter be transferred to another district pursuant to Title 28, Section 1407(a) of the U.S. Code without the request of a majority of plaintiffs.⁹  See Pub. L.

---

⁹See also Myriam Gilles, Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action, 104

No. 109-2, 119 Stat. 4, 11-12 (2005) (codified at 28 U.S.C. §
1332(d)(11)(C)(i)).

Were transferee judges content to work-up transferred cases
for trial on a reasonably short time schedule, sensitive to the
fact-finding contributions to be made by the American jury in the
district where congressionally mandated venue is proper -- while
at the same time exerting every effort to settle all those cases
amenable to settlement -- perhaps MDL practice might earn back
the respect it has lost.

A shining example of this technique is Judge Jack. See
supra note 8. Another is Judge Eldon Fallon of the Eastern
District of Louisiana, the transferee judge for the federal
lawsuits involving Vioxx:

> At last count, Merck faced close to 7,000 lawsuits
> related to Vioxx, and the number keeps growing. Two
> judges will play critical roles in how these cases play
> out. One is . . . U.S. District Judge Eldon Fallon of
> New Orleans.
>
> Fallon has control of all the federal Vioxx
> lawsuits, and he is hearing the case that starts in
> Houston today. . . . Today's trial is the first of
> four Vioxx trials Judge Fallon has scheduled for the

Mich. L. Rev. 373, 375 (2005) ("[I]n the ongoing and ever-
mutating battle between plaintiffs' lawyers and the protectors of
corporate interests, the corporate guys are winning. And they
are winning because they have developed a new set of tools
powerful enough to imperil the very viability of class actions in
many--actually, most--areas of the law. In fact, I believe it is
likely that, with a handful of exceptions, class actions will
soon be virtually extinct.").

next few months.  The four cases are intended to
represent the range of alleged harms caused by Vioxx.

Fallon is following a strategy he's used before to
push plaintiffs and drug makers to the settlement
table, by trying representative cases and letting their
outcomes in court set a price tag for an overall
settlement.  He's doing this despite Merck's insistence
that it will not settle and that the company will take
every case to court.

. . . .

Judge Fallon has promised a speedy trial.[10]

_____

[10] Apparently Judge Fallon doesn't mess around:

Unlike the two previous state-level cases . . . ,
the federal case before US District Judge Eldon Fallon
of New Orleans got off to a quick start.
It took less than two hours to pick a jury . . . .
Opening statements for the plaintiff . . . took less
than an hour and Merck's opening didn't take much
longer.

"1st Federal Vioxx Trial Focuses on Fla. Man's Death," The Boston
Globe, Nov. 30, 2005, at D2.

Many hard-working transferee judges are, of course,
comparable to Judges Jack and Fallon in their drive to get cases
to trial, yet are hesitant to return them to their home districts
because they fear increased delay stemming from the time
necessary for the hometown judge to come up to speed on a complex
case with many nuances, or because they fear that, as the
hometown court is swamped with judicial business, the returned
case will go to the bottom of the pile.  These judges see
legislative repeal of Lexecon as a way more efficiently to
allocate judicial business among the 94 district courts.
Conversation with Hon. Kathleen M. O'Malley (Jan. 23, 2006).

While these observations have bite, are they sufficient to
support the profound step of a nationwide venue for MDL cases,
largely at the option of defendants?  More modest steps might
achieve the same ends without marginalizing hometown juries:
e.g., the MDL panel could centralize cases in districts which
have the largest number of pending actions to facilitate the
trial of exemplar cases; transferee judges could be encouraged to
work more closely with transferor judges to see that exemplar or
ripe cases come promptly to trial; or -- though this is well
above the call of duty -- the transferee judge could receive an
intercircuit assignment to try the case in the hometown district.

21

Snighda Prakash, Federal Trial on Vioxx Opens in Houston, NPR
Morning Edition, Nov. 29, 2005 (emphasis added), audio recording
available at http://www.npr.org/templates/story/

story.php?storyId=5030553 (last visited Jan. 30, 2006).

## II.  Multi-District Litigation Practice in This Case.

This case illustrates how all this works in America today.
Dean Delaventura ("Delaventura") commenced this putative class
action on March 21, 2005 in the Massachusetts Superior Court
sitting in and for the County of Suffolk on his own behalf and on
behalf of others similarly situated.  See Notice of Removal [Doc.
No. 1], Ex. A.  Seeking to avoid federal court and MDL practice,
the complaint stated a single cause of action for breach of
contract.  The defendants Columbia Acorn Trust and Columbia Funds
Trusts I-IX ("Columbia"), alleging that this complaint was
preempted by the Securities Litigation Uniform Standards Act of
1998 ("SLUSA"), Pub. L. 105-353, 112 Stat. 3227 (1998) (codified
in scattered sections of 15 U.S.C.), removed this matter to
federal court from the Suffolk Superior Court on April 20, 2005.

---

See Hodges Interview at 12.  The federal courts'
videoconferencing system can, to a certain degree, make this more
palatable.  See, e.g., United States v. Mazzeo, 306 F. Supp. 2d
294, 303 & n.5 (E.D.N.Y. 2004); Andrea Doreen, Ltd. v. Building
Material Local Union 282, 299 F. Supp. 2d 129, 135 & n.6
(E.D.N.Y. 2004); Andrea Doreen, Ltd. v. Building Material Local
Union 282, 250 F. Supp. 2d 107, 110-11 & n.4 (E.D.N.Y. 2003).

See Notice of Removal. Columbia also filed a motion to stay the
proceedings while it pursued its efforts to fold this case into
an already existing MDL docket involving "market timing" issues.
Mot. to Stay [Doc. No. 5] at 2. Delaventura opposed the motion
to stay, see Mem. in Opp'n to Mot. to Stay [Doc. No. 7], and
filed a motion to remand the matter to state court on June 6,
2005, Mot. to Remand [Doc. No. 8]. Columbia filed an opposition
to the motion to remand. Mem. in Opp'n to Mot. to Remand [Doc.
No. 14] ("Columbia Opp'n"). The parties filed respective reply
briefs. [Doc. Nos. 13, 15]. This Court granted an expedited
hearing, held on June 14, 2005. See Electronic Clerk's Notes
(June 14, 2005).

Delaventura had moved to remand the matter to state court,
asserting that his class action suit "allege[d] a single cause of
action for breach of contract on behalf of certain holders of
mutual fund shares", and that his complaint, therefore, was not
preempted by SLUSA.[11] Mem. of Law in Supp. of Pl.'s Mot. to
Remand [Doc. No. 9] ("Delaventura Mem.") at 1. Delaventura
argued that this Court's decision in Meyer v. Putnam Int'l
Voyager Fund, 220 F.R.D. 127 (2004), counseled remand.
Delaventura Mem. at 4-5. He asserted that this case -- which
alleged that Columbia's market-timing activity related to certain

_____

[11] Delaventura likewise argued that the Investment Company
Act of 1940 did not preempt his claim. Delaventura Mem. at 7-8.

23

representations and warranties included in a prospectus and thus constituted a breach of contract -- resembled Meyer, where shareholders alleged a breach of fiduciary duty as a result of market-timing activity. Delaventura Mem. at 4. Delaventura argued that removal under SLUSA was improper, as the class action claim was not "in connection with the purchase or sale" of Columbia Mutual Fund B shares. Id. at 5 (arguing the claim "limits the proposed class to 'holders' of Class B shares as of February 24, 2004"). So, contended Delaventura, SLUSA should not apply nor preempt his state law claims. Id. at 6.

Columbia sought removal and transfer to the MDL panel, as "[t]he Federal Judicial Panel on Multidistrict Litigation has consolidated twelve of the suits with other market-timing cases in [MDL] No. 1586" and because "[a]mong the issues before the MDL Court is the scope of preemption under [SLUSA] . . . , specifically, whether particular cases within the market-timing MDL are either preempted by SLUSA or should be remanded to state court." Columbia Opp'n at 1. Columbia argued that Delaventura failed to demonstrate a reason why this market-timing case should not be heard by the MDL. Columbia Opp'n at 2. Further, Columbia argued that this Court's decision in Meyer, upon which Delaventura placed great weight, was decided prior to the creation of this MDL panel. Columbia Opp'n at 2. (arguing, also, that Meyer is distinguishable, as it involved an alleged breach

24

of fiduciary duty rather than a breach of contract). Columbia
contended that there was no good reason this matter should not be
decided together with other similar matters in the MDL. Id. at
3, 4-7, 8-12 (citing the substantial interest in judicial
economy).

At the close of the hearing, the Court denied Columbia's
motion to stay and took Delaventura's motion for remand under
advisement. The Court stated expressly, "If the multi-district
litigation panel orders [the case] transferred[,] they'll do so
over my opposition[,] which I now state on the record. I don't
agree that this case be transferred." Transcript of Proceedings
Held on June 14, 2005 [Doc. No. 16] at 22.[12]  On the supposition
that the motion to remand might be denied, the Court then
proceeded to hold an initial case management scheduling
conference pursuant to Local Rule 16.1, placing the case on the
Court's running trial list for July of 2006.[13]

On July 28, 2005 this Court entered an order denying
Delaventura's motion to remand. See Order of July 28, 2005 [Doc.
No. 20]. In its order, this Court indicated that a memorandum

[12] The Electronic Clerk's Notes for this hearing state that
"[i]f the MDL orders the case transferred, it will be done over
the objection of this court."

[13] This date is "for real." Since most cases settle, for
the past seven or eight years this Court -- with rare exceptions
-- has commenced trial of each of the cases so assigned during
the assigned month.

25

explaining the rationale for its decision would follow.  This
Court had found persuasive Columbia's substantive argument that,
given applicable case law, the misrepresentation claims were, in
actuality, "in connection with the purchase and sale of
securities" and, as such, preempted by the federal law.  On
August 10, 2005, however, upon application by Columbia, this
matter was ordered transferred to the Northern Division of the
District of Maryland, and the case before this Court was closed.
See [Doc. No. 21].

The Judicial Panel on Multi-District Litigation follows a
courteous practice of advising the district judge who may lose a
case as follows: "Although the consent of the transferor judge is
technically not required for a transfer under Section 1407, the
Panel prefers that all participating judges agree that transfer
would be for the convenience of the parties and witnesses and
would promote the just and efficient conduct of the litigation."
See, e.g., Letter from Hon. Wm. Terrell Hodges to Hon. Rya W.
Zobel (Oct. 26, 2005) (regarding MDL-1715 -- In re Ameriquest
Mortgage Co. Mortgage Lending Practices Litigation).  This Court
received no comparable letter in this case and does not know
whether the panel was ever advised of this Court's opposition to
the transfer.

26

## III. Conclusion

Current Muti-District Litigation practice is seriously flawed in that it is perceived to proceed not on neutral principles but in a manner that favors defendants. Were Congress to override Lexecon, this imbalance would be exacerbated and the already diminished role of the American jury further marginalized.

This Court's offer to try this case in July of 2006 still stands. Should the transferee court have the case ready for trial then -- or any time thereafter -- and be willing to return it, it will be promptly tried here in Boston.

By the Court

William G. Young
District Judge

27